**BROOKFIELD COMMUNICATIONS, INC., Plaintiff–Appellant,**

v.

**WEST COAST ENTERTAINMENT CORPORATION, Defendant– Appellee.**

**No. 98–56918.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1999.

Decided April 22, 1999.

Richard L. Stone (argued), Ronald S. Cohen, Carlo F. Van den Bosch, Sheppard, Mullin, Richter & Hampton, Los Angeles, California, for the plaintiff-appellant.

Dennis G. Martin (argued), Christina L. Johnson, Willmore F. Holbrow, III, Blakely, Sokoloff, Taylor & Zafman, Los Angeles, California, for the defendant-appellee.

Before: CANBY, O'SCANNLAIN, and WARDLAW, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must venture into cyberspace to determine whether federal trademark and unfair competition laws prohibit a video rental store chain from using an entertainment-industry information provider's trademark in the domain name of its web site and in its web site's metatags.

## I

Brookfield Communications, Inc. ("Brookfield") appeals the district court's denial of its motion for a preliminary injunction prohibiting West Coast Entertainment Corporation ("West Coast") from using in commerce terms confusingly similar to Brookfield's trademark, "MovieBuff." Brookfield gathers and sells information about the entertainment industry. Founded in 1987 for the purpose of creating and marketing software and services for professionals in the entertainment industry, Brookfield initially offered software applications featuring information such as recent film submissions, industry credits, professional contacts, and future projects. These offerings targeted major Hollywood film studios, independent production companies, agents, actors, directors, and producers.

Brookfield expanded into the broader consumer market with computer software featuring a searchable database containing entertainment-industry related information marketed under the "MovieBuff" mark around December 1993.[1] Brookfield's "MovieBuff" software now targets smaller companies and individual consumers who are not interested in purchasing Brookfield's professional level alternative, The Studio System, and includes comprehensive, searchable, entertainment-industry databases and related software applications containing information such as movie credits, box office receipts, films in development, film release schedules, entertainment news, and listings of executives, agents, actors, and directors. This "MovieBuff" software comes in three versions— (1) the MovieBuff Pro Bundle, (2) the MovieBuff Pro, and (3) MovieBuff—and is sold through various retail stores, such as Borders, Virgin Megastores, Nobody Beats

---

1. The parties quibble over whether the exact date was in December 1993 or in January 1994, but this dispute is irrelevant.

the Wiz, The Writer's Computer Store, Book City, and Samuel French Bookstores.

Sometime in 1996, Brookfield attempted to register the World Wide Web ("the Web") domain name "moviebuff.com" with Network Solutions, Inc. ("Network Solutions"),[2] but was informed that the requested domain name had already been registered by West Coast. Brookfield subsequently registered "brookfield-comm.com" in May 1996 and "moviebuffonline.com" in September 1996.[3] Sometime in 1996 or 1997, Brookfield began using its web sites to sell its "MovieBuff" computer software and to offer an Internet-based searchable database marketed under the "MovieBuff" mark. Brookfield sells its "MovieBuff" computer software through its "brookfieldcomm.com" and "moviebuffonline.com" web sites and offers subscribers online access to the MovieBuff database itself at its "inhollywood.com" web site.

On August 19, 1997, Brookfield applied to the Patent and Trademark Office (PTO) for federal registration of "MovieBuff" as a mark to designate both goods and services. Its trademark application describes its product as "computer software providing data and information in the field of the motion picture and television industries." Its service mark application describes its service as "providing multiple-user access to an on-line network database offering data and information in the field of the motion picture and television industries." Both federal trademark registrations issued on September 29, 1998. Brookfield had previously obtained a California state trademark registration for the mark "MovieBuff" covering "computer software" in 1994.

In October 1998, Brookfield learned that West Coast—one of the nation's largest video rental store chains with over 500 stores—intended to launch a web site at "moviebuff.com" containing, *inter alia*, a searchable entertainment database similar to "MovieBuff." West Coast had registered "moviebuff.com" with Network Solutions on February 6, 1996 and claims that it chose the domain name because the term "Movie Buff" is part of its service mark, "The Movie Buff's Movie Store," on which a federal registration issued in 1991 covering "retail store services featuring video cassettes and video game cartridges" and "rental of video cassettes and video game cartridges." West Coast notes further that, since at least 1988, it has also used various phrases including the term "Movie Buff" to promote goods and services available at its video stores in Massachusetts, including "The Movie Buff's Gift Guide"; "The Movie Buff's Gift Store"; "Calling All Movie Buffs!"; "Good News Movie Buffs!"; "Movie Buffs, Show Your Stuff!"; "the Perfect Stocking Stuffer for the Movie Buff!"; "A Movie Buff's Top Ten"; "The Movie Buff Discovery Program"; "Movie Buff Picks"; "Movie Buff Series"; "Movie Buff Selection Program"; and "Movie Buff Film Series."

On November 10, Brookfield delivered to West Coast a cease-and-desist letter alleging that West Coast's planned use of the "moviebuff.com" would violate Brookfield's trademark rights; as a "courtesy" Brookfield attached a copy of a complaint that it threatened to file if West Coast did not desist.

The next day, West Coast issued a press release announcing the imminent launch of its web site full of "movie reviews, Hollywood news and gossip, provocative commentary, and coverage of the independent film scene and films in production." The press release declared that the site would feature "an extensive database, which aids consumers in making educated decisions

---

**2.** Pursuant to a contract with the National Science Foundation, Network Solutions was, at all relevant times, the exclusive registrar of certain domain names, including those ending in ".com" The intricacies of the Internet and the Web are explained in detail in Part II.

**3.** It also registered "inhollywood.com," but exactly when it did so is unclear from the record.

about the rental and purchase of" movies and would also allow customers to purchase movies, accessories, and other entertainment-related merchandise on the web site.

Brookfield fired back immediately with a visit to the United States District Court for the Central District of California, and this lawsuit was born. In its first amended complaint filed on November 18, 1998, Brookfield alleged principally that West Coast's proposed offering of online services at "moviebuff.com" would constitute trademark infringement and unfair competition in violation of sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).[4] Soon thereafter, Brookfield applied *ex parte* for a temporary restraining order ("TRO") enjoining West Coast "[f]rom using ... in any manner ... the mark MOVIEBUFF, or any other term or terms likely to cause confusion therewith, including *moviebuff.com*, as West Coast's domain name, ... as the name of West Coast's website service, in buried code or metatags on their home page or web pages, or in connection with the retrieval of data or information on other goods or services."

On November 27, West Coast filed an opposition brief in which it argued first that Brookfield could not prevent West Coast from using "moviebuff.com" in commerce because West Coast was the senior user. West Coast claimed that it was the first user of "MovieBuff" because it had used its federally registered trademark, "The Movie Buff's Movie Store,"[5] since 1986 in advertisements, promotions, and letterhead in connection with retail services featuring videocassettes and video game cartridges. Alternatively, West Coast claimed seniority on the basis that it had garnered common-law rights in the domain name by using "moviebuff.com" before Brookfield began offering its "Mov-

ieBuff" Internet-based searchable database on the Web. In addition to asserting seniority, West Coast contended that its planned use of "moviebuff.com" would not cause a likelihood of confusion with Brookfield's trademark "MovieBuff" and thus would not violate the Lanham Act.

The district court heard arguments on the TRO motion on November 30. Later that day, the district court issued an order construing Brookfield's TRO motion as a motion for a preliminary injunction and denying it. The district court concluded that West Coast was the senior user of the mark "MovieBuff" for both of the reasons asserted by West Coast. The court also determined that Brookfield had not established a likelihood of confusion.

Brookfield responded by filing a notice of appeal from the denial of preliminary injunction followed by a motion in the district court for injunction pending appeal, which motion the district court denied. On January 16, 1999, West Coast launched its web site at "moviebuff.com." Fearing that West Coast's fully operational web site would cause it irreparable injury, Brookfield filed an emergency motion for injunction pending appeal with this court a few days later. On February 24, we granted Brookfield's motion and entered an order enjoining West Coast "from using, or facilitating the use of, in any manner, including advertising and promotion, the mark MOVIEBUFF, or any other term or terms likely to cause confusion therewith, including *@moviebuff.com* or *moviebuff.com*, as the name of West Coast's web site service, in buried code or metatags on its home page or web pages, or in connection with the retrieval of data or information on other goods or services." The injunction was to take effect upon the posting of a $25,000 bond in the district court by Brookfield. We scheduled oral

---

4. Brookfield also asserted a trademark dilution claim under 15 U.S.C. § 1125(c) and California state law trademark and unfair competition claims.

5. West Coast applied for a federal trademark registration for this term in 1989, which issued in 1991 and became incontestable in 1996. West Coast purports to have spent over $15,000,000 on advertisements and promotions featuring this mark.

argument on an expedited basis for March 10.

West Coast thereupon filed a motion for reconsideration and modification—seeking a stay of the injunction pending appeal and an increase in the bond requirement to $400,000—which we denied. After oral argument on March 10, we ordered that our previously issued injunction remain in effect pending the issuance of this opinion.

## II

To resolve the legal issues before us, we must first understand the basics of the Internet and the World Wide Web. Because we will be delving into technical corners of the Internet—dealing with features such as domain names and meta-tags—we explain in some detail what all these things are and provide a general overview of the relevant technology.

The Internet is a global network of interconnected computers which allows individuals and organizations around the world to communicate and to share information with one another. The Web, a collection of information resources contained in documents located on individual computers around the world, is the most widely used and fastest-growing part of the Internet except perhaps for electronic mail ("e-mail"). *See United States v. Microsoft,* 147 F.3d 935, 939 (D.C.Cir.1998). With the Web becoming an important mechanism for commerce, *see Reno v. ACLU,* 521 U.S. 844, 117 S.Ct. 2329, 2334, 138 L.Ed.2d 874 (1997) (citing an estimate that over 200 million people will use the Internet in 1999), companies are racing to stake out their place in cyberspace. Prevalent on the Web are multimedia "web pages"—computer data files written in Hypertext Markup Language ("HTML")—which contain information such as text, pictures, sounds, audio and video recordings, and links to other web pages. *See id.* at 2335; *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1318 (9th Cir.1998).

Each web page has a corresponding domain address, which is an identifier somewhat analogous to a telephone number or street address. Domain names consist of a second-level domain—simply a term or series of terms (e.g., westcoastvideo)—followed by a top-level domain, many of which describe the nature of the enterprise. Top-level domains include ".com" (commercial), ".edu" (educational), ".org" (non-profit and miscellaneous organizations), ".gov" (government), ".net" (networking provider), and ".mil" (military). *See Panavision,* 141 F.3d at 1318. Commercial entities generally use the ".com" top-level domain, which also serves as a catchall top-level domain. *See id.* To obtain a domain name, an individual or entity files an application with Network Solutions listing the domain name the applicant wants. Because each web page must have an unique domain name, Network Solution checks to see whether the requested domain name has already been assigned to someone else. If so, the applicant must choose a different domain name. Other than requiring an applicant to make certain representations, Network Solutions does not make an independent determination about a registrant's right to use a particular domain name. *See id.* at 1318–19.

Using a Web browser, such as Netscape's Navigator or Microsoft's Internet Explorer, a cyber "surfer" may navigate the Web—searching for, communicating with, and retrieving information from various web sites. *See id.; Microsoft,* 147 F.3d at 939–40, 950. A specific web site is most easily located by using its domain name. *See Panavision,* 141 F.3d at 1327. Upon entering a domain name into the web browser, the corresponding web site will quickly appear on the computer screen. Sometimes, however, a Web surfer will not know the domain name of the site he is looking for, whereupon he has two principal options: trying to guess the domain name or seeking the assistance of an Internet "search engine."

Oftentimes, an Internet user will begin by hazarding a guess at the domain name, especially if there is an obvious domain

name to try. Web users often assume, as a rule of thumb, that the domain name of a particular company will be the company name followed by ".com." *See id.; Playboy Enterprises v. Universal Tel–A–Talk, Inc.,* No. 96–6961, 1998 WL 767440, at *2 (E.D.Pa. Nov.3, 1998); *Cardservice Int'l, Inc. v. McGee,* 950 F.Supp. 737, 741 (E.D.Va.1997), *aff'd by,* 129 F.3d 1258 (4th Cir.1997). For example, one looking for Kraft Foods, Inc. might try "kraftfoods.com," and indeed this web site contains information on Kraft's many food products. Sometimes, a trademark is better known than the company itself, in which case a Web surfer may assume that the domain address will be " 'trademark'.com." *See Panavision,* 141 F.3d at 1327; *Beverly v. Network Solutions, Inc.,* No. 98–0337, 1998 WL 320829, at *1 (N.D.Cal. June 12, 1998) ("Companies attempt to make the search for their web site as easy as possible. They do so by using a corporate name, trademark or service mark as their web site address."). One interested in today's news would do well visiting "usatoday.com," which features, as one would expect, breaking stories from Gannett's USA Today. Guessing domain names, however, is not a risk-free activity. The Web surfer who assumes that " 'X'.com" will always correspond to the web site of company X or trademark X will, however, sometimes be misled. One looking for the latest information on Panavision, International, L.P., would sensibly try "panavision.com." Until recently, that Web surfer would have instead found a web site owned by Dennis Toeppen featuring photographs of the City of Pana, Illinois. *See Panavision,* 141 F.3d at 1319. Having registered several domain names that logically would have corresponded to the web sites of major companies such as Panavision, Delta Airlines, Neiman Marcus, Lufthansa, Toeppen sought to sell "panavision.com" to Panavision, which gives one a taste of some of the trademark issues that have arisen in cyberspace. *See id.; see also, e.g., Cardservice,* 950 F.Supp. at 740–42.

A Web surfer's second option when he does not know the domain name is to utilize an Internet search engine, such as Yahoo, Altavista, or Lycos. *See ACLU v. Reno,* 31 F.Supp.2d 473, 484 (E.D.Pa. 1999); *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 499 (E.D.Va.1999). When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword. Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used. *See Niton Corp. v. Radiation Monitoring Devices, Inc.,* 27 F.Supp.2d 102, 104 (D.Mass.1998); *Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227, 1231–32 (N.D.Ill.1996); *Shea v. Reno,* 930 F.Supp. 916, 929 (S.D.N.Y.1996), *aff'd,* —— U.S. ——, 117 S.Ct. 2501, 138 L.Ed.2d 1006 (1997). Search engines look for keywords in places such as domain names, actual text on the web page, and metatags. Metatags are HTML code intended to describe the contents of the web site. There are different types of metatags, but those of principal concern to us are the "description" and "keyword" metatags. The description metatags are intended to describe the web site; the keyword metatags, at least in theory, contain keywords relating to the contents of the web site. The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be "hit" in a search for that keyword and the higher on the list of "hits" the web page will appear. *See Niton,* 27 F.Supp.2d at 104.

With this basic understanding of the Internet and the Web, we may now analyze the legal issues before us.

### III

■ We review the district court's denial of preliminary injunctive relief for an abuse of discretion. *See, e.g., Foti v. City*

*of Menlo Park,* 146 F.3d 629, 634–35 (9th Cir.1998). Under this standard, reversal is appropriate only if the district court based its decision on clearly erroneous findings of fact or erroneous legal principles. *See FDIC v. Garner,* 125 F.3d 1272, 1276 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1299, 140 L.Ed.2d 466 (1998). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law," *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), so we review the underlying legal issues injunction de novo, *see, e.g., Barahona Gomez v. Reno,* 167 F.3d 1228, 1234 (9th Cir.1999); *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1142 (9th Cir.1998), *amended by,* 160 F.3d 541 (9th Cir.1998); *Foti,* 146 F.3d at 635; *Garner,* 125 F.3d at 1276; *San Antonio Community Hosp. v. Southern Cal. Dist. Council of Carpenters,* 125 F.3d 1230, 1234 (9th Cir.1997).

■ "A plaintiff is entitled to a preliminary injunction in a trademark case when he demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in his favor." *Sardi's Restaurant Corp. v. Sardie,* 755 F.2d 719, 723 (9th Cir.1985). To establish a trademark infringement claim under section 32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham Act, Brookfield must establish that West Coast is using a mark confusingly similar to a valid, protectable trademark of Brookfield's.[6] *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979). The district court denied Brookfield's motion for preliminary injunctive relief because it concluded that Brookfield had failed to establish that it was the senior user of the "MovieBuff" mark or that West Coast's use of the "moviebuff.com" domain name created a likelihood of confusion.

■ We review each of the district court's conclusions in turn.[7]

## IV

■ To resolve whether West Coast's use of "moviebuff.com" constitutes trademark infringement or unfair competition,[8]

---

6. Section 32(1) of the Lanham Act applies to federally registered marks and provides in pertinent part:

   Any person who shall, without the consent of the registrant—

   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ...

   shall be liable in a civil action by the registrant for the remedies hereinafter provided. 15 U.S.C. § 1114(1). The same standard is embodied in section 43(a)(1) of the Lanham Act, which applies to both registered and unregistered trademarks:

   Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...

   shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

7. Brookfield chose not to argue its trademark dilution claim or its state law causes of action in its opening brief. We accordingly deem those issues waived, *see All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu,* 7 F.3d 1427, 1434 (9th Cir.1993), and limit our attention to Brookfield's trademark infringement and unfair competition claims.

8. As is often done, Brookfield frames its claims under sections 32 and 43(a) of the Lanham Act in terms of trademark infringement and unfair competition, respectively. Whereas section 32 provides protection only to registered marks, section 43(a) protects against infringement of unregistered marks and trade dress as well as registered marks, *see, e.g., Kendall–Jackson Winery, Ltd. v. E. &*

we must first determine whether Brookfield has a valid, protectable trademark interest in the "MovieBuff" mark. Brookfield's registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of Brookfield's exclusive right to use the mark on the goods and services specified in the registration. *See* 15 U.S.C. §§ 1057(b); 1115(a). Nevertheless, West Coast can rebut this presumption by showing that it used the mark in commerce first, since a fundamental tenet of trademark law is that ownership of an inherently distinctive mark such as "MovieBuff" [9] is governed by priority of use. *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."), *cert. denied*, 521 U.S. 1103, 117 S.Ct. 2478, 138 L.Ed.2d 987 (1997). The first to use a mark is deemed the "senior" user and has the right to enjoin "junior" users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion. *See Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 842–43 (5th Cir.1990); *Tally–Ho, Inc. v. Coast Community College Dist.*, 889

F.2d 1018, 1023 (11th Cir.1989); *New West Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1200–01 (9th Cir.1979).

It is uncontested that Brookfield began selling "MovieBuff" software in 1993 and that West Coast did not use "moviebuff.com" until 1996. According to West Coast, however, the fact that it has used "The Movie Buff's Movie Store" as a trademark since 1986 makes it the first user for purposes of trademark priority. In the alternative, West Coast claims priority on the basis that it used "moviebuff.com" in commerce before Brookfield began offering its "MovieBuff" searchable database on the Internet. We analyze these contentions in turn.

### A

Conceding that the first time that it *actually* used "moviebuff.com" was in 1996, West Coast argues that its earlier use of "The Movie Buff's Movie Store" constitutes use of "moviebuff.com." [10] West Coast has not provided any Ninth Circuit precedent approving of this constructive use theory, but neither has Brookfield pointed us to any case law rejecting it. We are not without guidance, however, as our sister circuits have explicitly recognized the ability of a trademark owner to claim priority in a mark based on the first use date of a similar, but technically distinct, mark—but only in the exceptionally narrow instance where "the previously used mark is 'the legal equivalent of the mark in question or indistinguishable

J. Gallo Winery, 150 F.3d 1042, 1046 (9th Cir.1998), and protects against a wider range of practices such as false advertising and product disparagement, *see* 15 U.S.C. § 1125(a)(1)(B); *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Despite these differences, the analysis under the two provisions is oftentimes identical. Because we find this to be the case here, we use, for simplicity's sake, the term "infringement" to refer to Brookfield's claims under both sections 32 and 43(a) throughout the remainder of the opinion.

9. Both parties agree that "MovieBuff" is a suggestive mark, which falls within the category of inherently distinctive marks. The issue of inherent distinctiveness is discussed in further detail in Part V–A, *infra*.

10. West Coast's federally registered trademark "The Movie Buff's Movie Store" is now incontestable, meaning that its validity and legal protectability, as well as West Coast's ownership therein, are all conclusively presumed (subject to certain defenses not relevant here). *See* 15 U.S.C. §§ 1065, 1115(b); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

therefrom' such that consumers 'consider both as the same mark.'" *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 623 (6th Cir.1998) (*quoting Van Dyne–Crotty, Inc. v. Wear–Guard Corp.,* 926 F.2d 1156, 1159 (Fed.Cir.1991)); *accord Van Dyne–Crotty,* 926 F.2d at 1159. This constructive use theory is known as "tacking," as the trademark holder essentially seeks to "tack" his first use date in the earlier mark onto the subsequent mark. *See generally* 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 17:25–27 (4th ed.1998) [hereafter "McCarthy"].

▮ We agree that tacking should be allowed if two marks are so similar that consumers generally would regard them as essentially the same. Where such is the case, the new mark serves the same identificatory function as the old mark. Giving the trademark owner the same rights in the new mark as he has in the old helps to protect source-identifying trademarks from appropriation by competitors and thus furthers the trademark law's objective of reducing the costs that customers incur in shopping and making purchasing decisions. *See Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.,* 725 F.2d 336, 348 (5th Cir.1984).

Without tacking, a trademark owner's priority in his mark would be reduced each time he made the slightest alteration to the mark, which would discourage him from altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles. In *Hess's of Allentown, Inc. v. National Bellas Hess, Inc.,* for example, a department store ("Allentown") with trademark rights in the terms "Hess Brothers" and "Hess" dating from 1899 began promoting itself in 1952 instead as "Hess's," largely because customers and employees commonly referred to the store as "Hess's" rather than "Hess Brothers" or "Hess." *See* 169 U.S.P.Q. 673, 674–75, 1971 WL 16482 (T.T.A.B.1971).

Another department store ("Bellas") first used "Hess" in its mark around 1932. In light of the fact that Allentown first used "Hess's" after Bellas commenced using "Hess," Bellas would have priority on the basis of the actual first use dates of those two marks. Even though Allentown had acquired over a half-century's worth of goodwill in the essentially identical marks "Hess" and "Hess Brothers," Allentown no longer had trademark rights in those terms because it had ceased using those marks when it adopted "Hess's." Nevertheless, the Trademark Board allowed the owner of "Hess's" to tack his first use date of "Hess Brothers" and "Hess" onto "Hess's" since those terms were viewed as identical by the public. *See id.* at 677.

▮ The standard for "tacking," however, is exceedingly strict: "The marks must create the *same, continuing commercial impression,* and the later mark should not materially differ from or alter the character of the mark attempted to be tacked." *Van Dyne–Crotty,* 926 F.2d at 1159 (emphasis added) (citations and quotation marks omitted). In other words, "the previously used mark must be the *legal equivalent* of the mark in question or indistinguishable therefrom, and the consumer should consider both as the same mark." *Id.* (emphasis added); *see also Data Concepts,* 150 F.3d at 623 (adopting the *Van Dyne–Crotty* test). This standard is considerably higher than the standard for "likelihood of confusion," which we discuss *infra.*

The Federal Circuit, for example, concluded that priority in "CLOTHES THAT WORK. FOR THE WORK YOU DO" could not be tacked onto "CLOTHES THAT WORK." *See Van Dyne–Crotty,* 926 F.2d at 1160 (holding that the shorter phrase.was *not* the legal equivalent of the longer mark). The Sixth Circuit held that "DCI" and "dci" were too dissimilar to support tacking. *See Data Concepts,* 150 F.3d at 623–24. And the Trademark Board has rejected tacking in a case involving "American Mobilphone" with a star

and stripe design and "American Mobilphone Paging" with the identical design, *see American Paging, Inc. v. American Mobilphone, Inc.*, 13 U.S.P.Q.2d 2036, 1989 WL 274416 (T.T.A.B.1989), *aff'd*, 923 F.2d 869, 17 U.S.P.Q.2d 1726 (Fed.Cir.1990), as well as in a case involving "PRO–CUTS" and "PRO–KUT," *see Pro–Cuts v. Schilz–Price Enterprises*, 27 U.S.P.Q.2d 1224, 1227, 1993 WL 266611 (T.T.A.B.1993).

In contrast to cases such as *Van Dyne–Crotty* and *American Paging*, which were close questions, the present case is clear cut: "The Movie Buff's Movie Store" and "moviebuff.com" are very different, in that the latter contains three fewer words, drops the possessive, omits a space, and adds ".com" to the end. Because West Coast failed to make the slightest showing that consumers view these terms as identical, we must conclude that West Coast cannot tack its priority in "The Movie Buff's Movie Store" onto "moviebuff.com." As the Federal Circuit explained, "it would be clearly contrary to well-established principles of trademark law to sanction the tacking of a mark with a narrow commercial impression onto one with a broader commercial impression." *Van Dyne–Crotty*, 926 F.2d at 1160 (noting that prior use of "SHAPE UP" could not be tacked onto "EGO," that prior use of "ALTER EGO" could not be tacked onto "EGO," and that prior use of "Marco Polo" could not be tacked onto "Polo").

Since tacking does not apply, we must therefore conclude that Brookfield is the senior user because it marketed "Movie-Buff" products well before West Coast began using "moviebuff.com" in commerce: West Coast's use of "The Movie Buff's Movie Store" is simply irrelevant. Our priority determination is consistent with the decisions of our sister circuits in *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 362–63 (11th Cir.1997), *modified by*, 122 F.3d 1379 (11th Cir.1997) (per curiam), and *J. Wiss &*

*Sons Co. v. W.E. Bassett Co.*, 59 C.C.P.A. 1269, 462 F.2d 567, 568–69 (C.C.P.A.1972). Like the present case, *J. Wiss & Sons* is a three-competing-trademark situation in which one company owned a single mark with a first use date in between the first use dates of the two marks owned by the other company. In that case, the intervening mark ("Trim") was found to be confusingly similar with the later mark ("Trim–Line"), but not with the earlier mark ("Quick–Trim"); similarly here, the intervening mark ("MovieBuff") is purported to be confusingly similar with the later mark "moviebuff.com," *see infra* Part V, but is not confusingly similar with the earlier used mark "The Movie Buff's Movie Store," *see infra* p. 1050. The Court of Customs and Patent Appeals (now the Court of Appeals for the Federal Circuit) concluded that priority depended upon which of the two confusingly similar marks was used first—disregarding the first use date of the earlier used mark since it was not confusingly similar with the others. It thus awarded priority to the holder of the intervening mark, as we do similarly here.

*Longhorn Steaks*, involving the same basic three-competing-trademark situation, is particularly instructive. The defendant owned the mark "Lone Star Steaks" with a first use date between the plaintiff's earlier used mark "Lone Star Cafe" and its later used mark "Lone Star Steakhouse & Saloon." In its initial opinion, the Eleventh Circuit awarded priority to the holder of "Lone Star Steaks" on the basis that "Lone Star Steaks" was used before "Lone Star Steakhouse & Saloon." *See Longhorn Steaks*, 106 F.3d at 362–63. The Eleventh Circuit, however, later modified its opinion, stating that the conclusion reached in its initial opinion would be correct only if defendant's "Lone Star Steaks" was not confusingly similar to plaintiff's earlier used mark, "Lone Star Cafe." *See Longhorn Steaks*, 122 F.3d 1379 (11th Cir. 1997).[11]

---

11. The court then remanded the case to the district court to make a determination on this

question. *See id.* at 1382.

West Coast makes a half-hearted claim that "MovieBuff" is confusingly similar to its earlier used mark "The Movie Buff's Movie Store." If this were so, West Coast would undoubtedly be the senior user. *See id.* "Of course, if the symbol or device is already in general use, employed in such a manner that its adoption as an index of source or origin would only produce confusion and mislead the public, it is not susceptible of adoption as a trademark." *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 415, 36 S.Ct. 357, 60 L.Ed. 713 (1916). West Coast, however, essentially conceded that "MovieBuff" and "The Movie Buff's Movie Store" are not confusingly similar when it stated in its pre-argument papers that it does not allege actual confusion between "MovieBuff" and West Coast's federally registered mark. We cannot think of more persuasive evidence that there is no *likelihood* of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what. *See Libman Co. v. Vining Indus., Inc.,* 69 F.3d 1360, 1361 (7th Cir.1995) ("Vining sold several hundred thousand of the allegedly infringing brooms, yet there is no evidence that any consumer ever made such an error; if confusion were likely, one would expect at least one person out of this vast multitude to be confused...."). The failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy. *See Eclipse Associates Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1118–19 (9th Cir. 1990); *Sleekcraft,* 599 F.2d at 353. West Coast, however, did not state that it could not *prove* actual confusion; rather, it con-

ceded that there has been none. This is a crucial difference. Although there may be the rare case in which a likelihood of future confusion is possible even where it is conceded that two marks have been used simultaneously for years with no resulting confusion, West Coast has not shown this to be such a case.

Our conclusion comports with the position of the PTO, which effectively announced its finding of no likelihood of confusion between "The Movie Buff's Movie Store" and "MovieBuff" when it placed the latter on the principal register despite West Coast's prior registration of "The Movie Buff's Movie Store." Priority is accordingly to be determined on the basis of whether Brookfield used "MovieBuff" or West Coast used "moviebuff.com" first.[12]

## B

West Coast argues that we are mixing apples and oranges when we compare its first use date of "moviebuff.com" with the first sale date of "MovieBuff" *software.* West Coast reminds us that Brookfield uses the "MovieBuff" mark with both computer software and the provision of an Internet database; according to West Coast, its use of "moviebuff.com" can cause confusion only with respect to the latter. West Coast asserts that we should accordingly determine seniority by comparing West Coast's first use date of "moviebuff.com" not with when Brookfield first sold software, but with when it first offered its database online.

As an initial matter, we note that West Coast's argument is premised on the assumption that its use of "moviebuff.com" does not cause confusion between its web site and Brookfield's "MovieBuff" software

---

12. The present case differs from the Fourth Circuit's *Lone Star* case (yet another involving the same three-trademark setup) for exactly the same reason that it differs from the Eleventh Circuit's *Lone Star* case. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922 (4th Cir.1995). The Fourth Circuit awarded priority to the compa-

ny owning the earlier and later trademarks over the company owning the intervening mark, because the intervening mark ("Lone Star Grill") was found to be confusingly similar with the *earlier* of the other two marks ("Lone Star Cafe") as well as with the later mark ("Lone Star Steakhouse & Saloon"). *See id.* at 931–32.

products. Even though Brookfield's computer software and West Coast's offerings on its web site are not identical products, likelihood of confusion can still result where, for example, there is a likelihood of expansion in product lines. *See Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1394 (9th Cir.1993). As the leading trademark commentator explains: "When a senior user of a mark on product line A expands later into product line B and finds an intervening user, priority in product line B is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation at the time of the intervening user's appearance." 2 McCarthy § 16:5. We need not, however, decide whether the Web was within Brookfield's natural zone of expansion, because we conclude that Brookfield's use of "MovieBuff" as a service mark preceded West Coast's use.

▆▆▆▆ Brookfield first used "Movie-Buff" on its Internet-based products and services in August 1997,[13] so West Coast can prevail only if it establishes first use earlier than that. In the literal sense of the word, West Coast "used" the term "moviebuff.com" when it registered that domain address in February 1996. Registration with Network Solutions, however, does not in itself constitute "use" for purposes of acquiring trademark priority. *See Panavision,* 141 F.3d at 1324–25. The Lanham Act grants trademark protection only to marks that are used to identify and to distinguish goods or services in commerce—which typically occurs when a mark is used in conjunction with the actual sale of goods or services. The purpose of a trademark is to help consumers identify the source, but a mark cannot serve a source-identifying function if the public has never seen the mark and thus is not meritorious of trademark protection until it is used in public in a manner that creates an association among consumers between the mark and the mark's owner.

Such use requirement is firmly established in the case law, *see, e.g., Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 334, 59 S.Ct. 191, 83 L.Ed. 195 (1938); *New West,* 595 F.2d at 1198–99, and, moreover, is embodied in the Lanham Act itself. *See* 15 U.S.C. § 1127 ("The term 'trademark' includes any word, name, symbol, or device, or any combination thereof ... *used by a person ... to identify and distinguish* his or her goods.") (emphasis added); *id.* ("The term 'service mark' means any word, name, symbol, or device, or any combination thereof ... *used by a person ... to identify and distinguish* the services of one person) (emphasis added). In fact, Congress amended the Lanham Act in 1988 to strengthen this "use in commerce" requirement, making clear that trademark rights can be conveyed only through "the bona fide use of a mark in the ordinary course of trade, and not [use] made merely to reserve a mark." 15 U.S.C. § 1127. Congress provided more specifically:

> For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—

---

13. The exact date that Brookfield began offering "MovieBuff" products over the Web is the subject of bitter dispute. In its opening brief, Brookfield specifically averred: "In January of 1996, Brookfield also launched a web site that made the MOVIEBUFF software and database available via the Internet." West Coast questions the veracity of Brookfield's claims, pointing out that Brookfield did not even register a domain name with Network Solutions until May 1996. Having reviewed the evidence before us, we too find it a mystery how Brookfield could have "launched a web site" in January 1996 when it did not have a domain address at which it could operate a web site until May 1996. *See infra* Part II.

Accordingly, we conclude that Brookfield failed to produce evidence establishing its claim that it began using the "MovieBuff" in conjunction with its Internet database in January 1996. Because "MovieBuff" is a federally registered trademark, however, Brookfield is entitled to a presumptive first used date equivalent to the filing date of its trademark registration application, which was August 1997. *See Rolley, Inc. v. Younghusband,* 204 F.2d 209, 210 (9th Cir.1953).

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

*Id.*

■ The district court, while recognizing that mere registration of a domain name was not sufficient to constitute commercial use for purposes of the Lanham Act, nevertheless held that registration of a domain name with the intent to use it commercially was sufficient to convey trademark rights. This analysis, however, contradicts both the express statutory language and the case law which firmly establishes that trademark rights are not conveyed through mere intent to use a mark commercially, *see, e.g., Allard Enters. v. Advanced Programming Resources, Inc.,* 146 F.3d 350, 356 (6th Cir.1998); *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 504 (7th Cir.1992) ("[A]n intent to use a mark creates no rights a competitor is bound to respect."), nor through mere preparation to use a term as a trademark, *see, e.g., Hydro–Dynamics, Inc. v. George Putnam & Co.,* 811 F.2d 1470, 1473–74 (Fed.Cir. 1987); *Computer Food Stores, Inc. v. Corner Store Franchises,* 176 U.S.P.Q. 535, 538, 1973 WL 19922 (T.T.A.B.1973).

West Coast no longer disputes that its use—for purposes of the Lanham Act—of "moviebuff.com" did not commence until after February 1996. It instead relies on the alternate argument that its rights vested when it began using "moviebuff.com" in e-mail correspondence with lawyers and customers sometime in mid–1996. West Coast's argument is not without support in our case law—we have indeed held that trademark rights can vest even before any goods or services are actually sold if "the totality of [one's] prior actions, taken together, [can] establish a right to use the trademark." *New West,* 595 F.2d at 1200. Under *New West,* however, West Coast must establish that its e-mail correspondence constituted " '[u]se in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.' " *Id.* (quoting *New England Duplicating Co. v. Mendes,* 190 F.2d 415, 418 (1st Cir.1951)); *see also Marvel Comics Ltd. v. Defiant,* 837 F.Supp. 546, 550 (S.D.N.Y.1993) ("[T]he talismanic test is whether or not the use was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.") (quotation marks and citation omitted).

West Coast fails to meet this standard. Its purported "use" is akin to putting one's mark "on a business office door sign, letterheads, architectural drawings, etc." or on a prototype displayed to a potential buyer, both of which have been held to be insufficient to establish trademark rights. *See Steer Inn Systems, Inc. v. Laughner's Drive–In, Inc.,* 56 C.C.P.A. 911, 405 F.2d 1401, 1402 (C.C.P.A.1969); *Walt Disney Productions v. Kusan, Inc.,* 204 U.S.P.Q. 284, 288 (C.D.Cal.1979). Although widespread publicity of a company's mark, such as Marvel Comics's announcement to 13 million comic book readers that "Plasma" would be the title of a new comic book, *see Marvel Comics,* 837 F.Supp. at 550, or the mailing of 430,000 solicitation letters with one's mark to potential subscribers of a magazine, *see New West,* 595 F.2d at 1200, may be sufficient to create an association among the public between the mark and West Coast, mere use in limited e-mail correspondence with lawyers and a few customers is not.

West Coast first announced its web site at "moviebuff.com" in a public and widespread manner in a press release of November 11, 1998, and thus it is not until at least that date that it first used the "moviebuff.com" mark for purposes of the Lanham Act.[14] Accordingly, West Coast's argument that it has seniority because it used "moviebuff.com" before Brookfield used "MovieBuff" as a service mark fails on its own terms. West Coast's first use date was *neither* February 1996 when it registered its domain name with Network Solutions as the district court had concluded, *nor* April 1996 when it first used "moviebuff.com" in e-mail communications, but *rather* November 1998 when it first made a widespread and public announcement about the imminent launch of its web site. Thus, West Coast's first use of "moviebuff.com" was preceded by Brookfield's first use of "MovieBuff" in conjunction with its online database, making Brookfield the senior user.

For the foregoing reasons, we conclude that the district court erred in concluding that Brookfield failed to establish a likelihood of success on its claim of being the senior user.

### V

Establishing seniority, however, is only half the battle. Brookfield must also show that the public is likely to be somehow confused about the source or sponsorship of West Coast's "moviebuff.com" web site—and somehow to associate that site with Brookfield. *See* 15 U.S.C. § 1114(1); 1125(a).[15] The Supreme Court has described "the basic objectives of trademark law" as follows: "trademark law, by preventing others from copying a source-identifying mark, 'reduce[s] the customer's costs of shopping and making purchasing decisions,' for it quickly and easily assures a potential customer that this item—the

item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Qualitex,* 514 U.S. at 163–64 (internal citations omitted). Where two companies each use a different mark and the simultaneous use of those marks does not cause the consuming public to be confused as to who makes what, granting one company exclusive rights over both marks does nothing to further the objectives of the trademark laws; in fact, prohibiting the use of a mark that the public has come to associate with a company would actually contravene the intended purposes of the trademark law by making it *more* difficult to identify and to distinguish between different brands of goods.

"The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Official Airline Guides,* 6 F.3d at 1391 (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992)) (quotation marks omitted); *accord International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 825 (9th Cir.1993); *Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir.1993). We look to the following factors for guidance in determining the likelihood of confusion: similarity of the conflicting designations; relatedness or proximity of the two companies' products or services; strength of Brookfield's mark; marketing channels used; degree of care likely to be exercised by purchasers in selecting goods; West Coast's intent in selecting its mark; evidence of actual confusion; and likelihood of

---

14. Brookfield is willing to grant West Coast a first use date of November 11, 1998. Thus, we need not decide here whether the issuance of the press release was indeed sufficient to constitute use in commerce under the Lanham Act. *See* 15 U.S.C. § 1127.

15. More precisely, because we are at the preliminary injunction stage, Brookfield must establish that it is likely to be able to show such a likelihood of confusion. *See Sardi's Restaurant,* 755 F.2d at 723.

expansion in product lines. *See Dr. Seuss Enters. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (9th Cir.1997), *petition for cert. dismissed by,* —— U.S. ——, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997); *Sleekcraft,* 599 F.2d at 348–49; *see also* Restatement (Third) of Unfair Competition §§ 20–23 (1995). These eight factors are often referred to as the *Sleekcraft* factors.

▬ A word of caution: this eight-factor test for likelihood of confusion is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific. Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors. *See Dreamwerks Prod. Group v. SKG Studio,* 142 F.3d 1127, 1130–32 (9th Cir.1998). Moreover, the foregoing list does not purport to be exhaustive, and non-listed variables may often be quite important. We must be acutely aware of excessive rigidity when applying the law in the Internet context; emerging technologies require a flexible approach.

### A

▬ We begin by comparing the allegedly infringing mark to the federally registered mark.[16] The similarity of the marks will always be an important factor. Where the two marks are entirely dissimilar, there is no likelihood of confusion. "Pepsi" does not infringe Coca-Cola's "Coke." Nothing further need be said. Even where there is precise identity of a complainant's and an alleged infringer's mark, there may be no consumer confusion—and thus no trademark infringement—if the alleged infringer is in a different geographic area or in a wholly different industry. *See Weiner King, Inc. v. Wiener King Corp.,* 615 F.2d 512, 515–16, 521–22 (C.C.P.A.1980) (permitting concurrent use of "Weiner King" as a mark for restaurants featuring hot dogs in New Jersey and "Wiener King" as a mark for restaurants in North Carolina); *Pinocchio's Pizza Inc. v. Sandra Inc.,* 11 U.S.P.Q.2d 1227, 1228, 1989 WL 297867 (T.T.A.B.1989) (permitting concurrent use of "PINOCCHIO'S" as a service mark for restaurants in Maryland and "PI-NOCCHIOS" as a service mark for restaurants elsewhere in the country). Nevertheless, the more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion. *See, e.g., Dreamwerks,* 142 F.3d at 1131; *Goss,* 6 F.3d at 1392 ("The court assesses the similarity of the marks in terms of their sight, sound, and meaning."). In analyzing this factor, "[t]he marks must be considered in their entirety and as they appear in the marketplace," *Goss,* 6 F.3d at 1392 (citing *Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601, 605–06 (9th Cir. 1987)), with similarities weighed more heavily than differences, *see id.* (citing

---

**16.** Many cases begin the likelihood of confusion analysis by considering the strength of the allegedly infringed mark. Heeding our repeated warnings against simply launching into a mechanical application of the eight-factor *Sleekcraft* test, *see, e.g., Dreamwerks,* 142 F.3d at 1129; *Dr. Seuss,* 109 F.3d at 1404, and rather than automatically adopting the ordering of *Sleekcraft* and *Dr. Seuss,* we consider the *Sleekcraft* factors (roughly) in order of their importance in this particular case. *See, e.g., Dreamwerks,* 142 F.3d at 1130–31 (considering the eight *Sleekcraft* factors "out of order").

Although the Ninth Circuit has yet to apply the likelihood of confusion analysis in the Internet context, a district court applying Ninth Circuit law based its finding of likelihood of confusion on (1) the virtual identity of marks, (2) the relatedness of plaintiff's and defendant's goods, and (3) the simultaneous use of the Web as a marketing channel. *See Comp Examiner Agency, Inc. v. Juris, Inc.,* No. 96–0213, 1996 WL 376600, at *1 (C.D.Cal. Apr.26, 1996). Consistently with *Comp Examiner,* we conclude that these three *Sleekcraft* factors are the most important in this case and accordingly commence our analysis by examining these factors first.

*Rodeo Collection Ltd. v. West Seventh*, 812 F.2d 1215, 1219 (9th Cir.1987)).

In the present case, the district court found West Coast's domain name "moviebuff.com" to be quite different than Brookfield's domain name "moviebuffonline.com." Comparison of domain names, however, is irrelevant as a matter of law, since the Lanham Act requires that the allegedly infringing mark be compared with the claimant's *trademark, see* 15 U.S.C. § 1114(1), 1125(a), which here is "MovieBuff," not "moviebuffonline.com." Properly framed, it is readily apparent that West Coast's allegedly infringing mark is essentially identical to Brookfield's mark "MovieBuff." In terms of appearance, there are differences in capitalization and the addition of ".com" in West Coast's complete domain name, but these differences are inconsequential in light of the fact that Web addresses are not caps-sensitive and that the ".com" top-level domain signifies the site's commercial nature.

Looks aren't everything, so we consider the similarity of sound and meaning. The two marks are pronounced the same way, except that one would say "dot com" at the end of West Coast's mark. Because many companies use domain names comprised of ".com" as the top-level domain with their corporate name or trademark as the second-level domain, *see Beverly*, 1998 WL 320829, at *1, the addition of ".com" is of diminished importance in distinguishing the mark. The irrelevance of the ".com" becomes further apparent once we consider similarity in meaning. The domain name is more than a mere address: like trademarks, second-level domain names communicate information as to source. As we explained in Part II, many Web users

are likely to associate "moviebuff.com" with the trademark "MovieBuff," thinking that it is operated by the company that makes "MovieBuff" products and services.[17] Courts, in fact, have routinely concluded that marks were essentially identical in similar contexts. *See, e.g., Public Serv. Co. v. Nexus Energy Software, Inc.,* 36 F.Supp.2d 456, —— (D.Mass.1999) (finding "energyplace.com" and "Energy Place" to be virtually identical); *Minnesota Mining & Mfg. Co. v. Taylor,* 21 F.Supp.2d 1003, 1005 (D.Minn. 1998) (finding "post-it.com" and "Post–It" to be the same); *Interstellar Starship Services, Ltd. v. EPIX, Inc.,* 983 F.Supp. 1331, 1335 (D.Or.1997) ("In the context of Internet use, ['epix.com'] is the same mark as ['EPIX']."); *Planned Parenthood Federation of America, Inc. v. Bucci,* No. 97–0629, 1997 WL 133313, at *8 (S.D.N.Y. Mar.24, 1997) (concluding that "plannedparenthood.com" and "Planned Parenthood" were essentially identical), *aff'd by,* 152 F.3d 920, 1998 WL 336163 (2d Cir. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998). As "MovieBuff" and "moviebuff.com" are, for all intents and purposes, identical in terms of sight, sound, and meaning, we conclude that the similarity factor weighs heavily in favor of Brookfield.[18]

The similarity of marks alone, as we have explained, does not necessarily lead to consumer confusion. Accordingly, we must proceed to consider the relatedness of the products and services offered. Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods. *See Official Airline Guides,* 6 F.3d at 1392

---

**17.** In an analogous context, courts have granted trademark protection to phone numbers that spell out a corporation's name, trademark, or slogan. *See Dial–A–Mattress Franchise Corp. v. Page,* 880 F.2d 675, 677–78 (2d Cir.1989) (granting trademark protection to "(area code)-MATTRES"); *American Airlines, Inc. v. A 1–800–A–M–E–R–I–C–A–N Corp.,* 622 F.Supp. 673, 683–84 (N.D.Ill. 1985); *see also Dranoff–Perlstein Assocs. v. Sklar,* 967 F.2d 852, 856–58 (3d Cir.1992).

*But see Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619, 622 (6th Cir.1996).

**18.** The fact that West Coast's second-level domain is *exactly* the same as Brookfield's mark is particularly important since potential customers of "MovieBuff" will go to "moviebuff.com," and not, for example, "moviebuffs.com." Had West Coast used the latter mark, the similarity factor would have favored Brookfield to a lesser extent.

(citing *Sleekcraft*, 599 F.2d at 350). In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course. *See Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 256–57 (9th Cir.1986) (reversing a district court's finding of no likelihood of confusion even though the six other likelihood of confusion factors all weighed against a finding of likelihood of confusion); *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). If, on the other hand, Brookfield and West Coast did not compete to any extent whatsoever, the likelihood of confusion would probably be remote. A Web surfer who accessed "moviebuff.com" and reached a web site advertising the services of Schlumberger Ltd. (a large oil drilling company) would be unlikely to think that Brookfield had entered the oil drilling business or was sponsoring the oil driller. *See, e.g., Toys "R" Us, Inc. v. Feinberg*, 26 F.Supp.2d 639, 643 (S.D.N.Y.1998) (no likelihood of confusion between "gunsrus.com" firearms web site and "Toys 'R' Us" trademark); *Interstellar Starship*, 983 F.Supp. at 1336 (finding no likelihood of confusion between use of "epix.com" to advertise the Rocky Horror Picture Show and "Epix" trademark registered for use with computer circuit boards). At the least, Brookfield would bear the heavy burden of demonstrating (through other relevant factors) that consumers were likely to be confused as to source or affiliation in such a circumstance.

The district court classified West Coast and Brookfield as non-competitors largely on the basis that Brookfield is primarily an information provider while West Coast primarily rents and sells videotapes. It noted that West Coast's web site is used more by the somewhat curious video consumer who wants general movie information, while entertainment industry professionals, aspiring entertainment executives and professionals, and highly focused moviegoers are more likely to need or to want the more detailed information provided by "MovieBuff." This analysis, however, overemphasizes differences in principal lines

of business, as we have previously instructed that "the relatedness of each company's prime directive isn't relevant." *Dreamwerks*, 142 F.3d at 1131. Instead, the focus is on whether the consuming public is likely somehow to associate West Coast's products with Brookfield. *See id.* Here, both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys, *see Toys "R" Us*, 26 F.Supp.2d at 643, or computer circuit boards and the Rocky Horror Picture Show, *see Interstellar Starship*, 983 F.Supp. at 1336. Thus, Brookfield and West Coast are not properly characterized as non-competitors. *See American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) (concluding that although the parties were not direct competitors, they both provided financial services and that customer confusion could result in light of the similarities between the companies' services).

Not only are they not non-competitors, the competitive proximity of their products is actually quite high. Just as Brookfield's "MovieBuff" is a searchable database with detailed information on films, West Coast's web site features a similar searchable database, which Brookfield points out is licensed from a direct competitor of Brookfield. Undeniably then, the products are used for similar purposes. "[T]he rights of the owner of a registered trademark ... extend to any goods related in the minds of consumers," *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir.1985), and Brookfield's and West Coast's products are certainly so related to some extent. The relatedness is further evidenced by the fact that the two companies compete for the patronage of an overlapping audience. The use of similar marks to offer similar products accordingly weighs heavily in favor of likelihood of confusion. *See Sleekcraft*, 599 F.2d at 348 (concluding that high-speed waterskiing

racing boats are sufficiently related to family-oriented recreational boats that the public is likely to be confused as to the source of the boats); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 153–55 (9th Cir.1963) (concluding that beer and whiskey are sufficiently similar to create a likelihood of confusion regarding the source of origin when sold under the same trade name); *see also Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1118 (6th Cir.1996).

In addition to the relatedness of products, West Coast and Brookfield both utilize the Web as a marketing and advertising facility, a factor that courts have consistently recognized as exacerbating the likelihood of confusion. *See, e.g., Public Serv. Co.*, 36 F.Supp.2d at 439; *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F.Supp.2d 488, 499 (E.D.Va.1999); *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 304–05 (D.N.J. 1998), *aff'd*, 159 F.3d 1351 (3d Cir.1998); *Interstellar Starship Servs.*, 983 F.Supp. at 1336; *Planned Parenthood Fed'n of America*, 1997 WL 133313, at *8. Both companies, apparently recognizing the rapidly growing importance of Web commerce, are maneuvering to attract customers via the Web. Not only do they compete for the patronage of an overlapping audience on the Web, both "MovieBuff" and "moviebuff.com" are utilized in conjunction with Web-based products.

Given the virtual identity of "moviebuff.com" and "MovieBuff," the relatedness of the products and services accompanied by those marks, and the companies' simultaneous use of the Web as a marketing and advertising tool, many forms of consumer confusion are likely to result. People surfing the Web for information on "MovieBuff" may confuse "MovieBuff" with the searchable entertainment database at "moviebuff.com" and simply assume that they have reached Brookfield's web site. *See, e.g., Cardservice Int'l*, 950 F.Supp. at 741. In the Internet context, in particular, entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership. Alternatively, they may incorrectly believe that West Coast licensed "MovieBuff" from Brookfield, *see, e.g., Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd.*, 34 F.3d 410, 415–16 (7th Cir. 1994), or that Brookfield otherwise sponsored West Coast's database, *see E. Remy Martin*, 756 F.2d at 1530; *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir.1985). Other consumers may simply believe that West Coast bought out Brookfield or that they are related companies.

Yet other forms of confusion are likely to ensue. Consumers may wrongly assume that the "MovieBuff" database they were searching for is no longer offered, having been replaced by West Coast's entertainment database, and thus simply use the services at West Coast's web site. *See, e.g., Cardservice Int'l*, 950 F.Supp. at 741. And even where people realize, immediately upon accessing "moviebuff.com," that they have reached a site operated by West Coast and wholly unrelated to Brookfield, West Coast will still have gained a customer by appropriating the goodwill that Brookfield has developed in its "MovieBuff" mark. A consumer who was originally looking for Brookfield's products or services may be perfectly content with West Coast's database (especially as it is offered free of charge); but he reached West Coast's site because of its use of Brookfield's mark as its second-level domain name, which is a misappropriation of Brookfield's goodwill by West Coast. *See infra* Part V.B.

The district court apparently assumed that likelihood of confusion exists only when consumers are confused as to the source of a product they actually purchase. It is, however, well established that the Lanham Act protects against the many other forms of confusion that we have outlined. *See Pebble Beach*, 155 F.3d at 544;

*Indianapolis Colts,* 34 F.3d at 415–16; *Fuji Photo Film,* 754 F.2d at 596; *HMH Pub. Co. v. Brincat,* 504 F.2d 713, 716–17 & n.7 (9th Cir.1974); *Fleischmann Distilling,* 314 F.2d at 155.

■■■■■ The factors that we have considered so far—the similarity of marks, the relatedness of product offerings, and the overlap in marketing and advertising channels—lead us to the tentative conclusion that Brookfield has made a strong showing of likelihood of confusion. Because it is possible that the remaining factors will tip the scale back the other way if they weigh strongly enough in West Coast's favor, we consider the remaining likelihood of confusion factors, beginning with the strength of Brookfield's mark. The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws. *See Kenner Parker Toys Inc. v. Rose Art Indus., Inc.,* 963 F.2d 350, 353 (Fed.Cir.1992); *Nutri/System,* 809 F.2d at 605. Marks can be conceptually classified along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.[19] *See Two Pesos,* 505 U.S. at 768. West Coast asserts that Brookfield's mark is "not terribly distinctive," by which it apparently means suggestive, but only weakly so. Although Brookfield does not seriously dispute that its mark is only suggestive, it does defend its (mark's) muscularity.

■■■■■ We have recognized that, unlike arbitrary or fanciful marks which are typi-

cally strong, suggestive marks are presumptively weak. *See, e.g., Nutri/System,* 809 F.2d at 605. As the district court recognized, placement within the conceptual distinctiveness spectrum is not the only determinant of a mark's strength, as advertising expenditures can transform a suggestive mark into a strong mark, *see id.,* where, for example, that mark has achieved actual marketplace recognition, *see Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 743–44 (2d Cir.1998). Brookfield, however, has not come forth with substantial evidence establishing the widespread recognition of its mark; although it argues that its strength is established from its use of "MovieBuff" for over five years, its federal and California state registrations, and its expenditure of $100,-000 in advertising its mark, the district court did not clearly err in classifying "MovieBuff" as weak. Some weak marks are · weaker than others, and although "MovieBuff" falls within the weak side of the strength spectrum, the mark is not so flabby as to compel a finding of no likelihood of confusion in light of the other factors that we have considered. Importantly, Brookfield's trademark is not descriptive because it does not describe either the software product or its purpose. Instead, it is suggestive—and thus strong enough to warrant trademark protection—because it requires a mental leap from the mark to the product. *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization,* 59 F.3d 902, 910–11 (9th Cir.1995). Because the products involved are closely related and West Coast's domain name is nearly identical to Brook-

---

**19.** Generic terms are those used by the public to refer generally to the product rather than a particular brand of the product. *See, e.g., Blinded Veterans Assoc. v. Blinded American Veterans Found.,* 872 F.2d 1035, 1041 (D.C.Cir.1989) ("Blinded Veterans"); *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75 (7th Cir.1977) ("Light Beer" or "Lite Beer"). Descriptive terms directly describe the quality or features of the product. *See, e.g., Application of Keebler Co.,* 479 F.2d 1405 (C.C.P.A.1973) ("Rich 'N Chips" chocolate chip cookies). A suggestive mark conveys an impression of a good but requires the exercise

of some imagination and perception to reach a conclusion as to the product's nature. *See, e.g., American Home Prods. Corp. v. Johnson Chem. Co.,* 589 F.2d 103 (2d Cir.1978) ("Roach Motel" insect trap). Arbitrary and fanciful marks have no intrinsic connection to the product with which the mark is used; the former consists of words commonly used in the English language, *see, e.g., Fleischmann Distilling,* 314 F.2d 149 ("Black & White" scotch whiskey), whereas the latter are wholly made-up terms, *see, e.g., Clorox Chem. Co. v. Chlorit Mfg. Corp.,* 25 F.Supp. 702 (E.D.N.Y. 1938) ("Clorox" bleach).

field's trademark, the strength of the mark is of diminished importance in the likelihood of confusion analysis. *See McCarthy* ¶ 11:76 ("Whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related.").

We thus turn to intent. "The law has long been established that if an infringer 'adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities.'" *Pacific Telesis v. International Telesis Comms.*, 994 F.2d 1364, 1369 (9th Cir.1993) (quoting Restatement of Torts, § 729, Comment on Clause (b)f (1938)). An inference of confusion has similarly been deemed appropriate where a mark is adopted with the intent to deceive the public. *See Gallo*, 967 F.2d at 1293 (citing *Sleekcraft*, 599 F.2d at 354). The district court found that the intent factor favored West Coast because it did not adopt the "moviebuff.com" mark with the specific purpose of infringing Brookfield's trademark. The intent prong, however, is not so narrowly confined.

■ This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark. *See Official Airline Guides*, 6 F.3d at 1394 ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public."); *Fleischmann Distilling*, 314 F.2d 149 at 157. In the Internet context, in particular, courts have appropriately recognized that the intentional registration of a domain name knowing that the second-level domain is another company's valuable trademark weighs in favor of likelihood of confusion. *See, e.g., Washington Speakers*, 33 F.Supp.2d 488, 500. There is, how-

ever, no evidence in the record that West Coast registered "moviebuff.com" with the principal intent of confusing consumers.[20] Brookfield correctly points out that, by the time West Coast launched its web site, it *did* know of Brookfield's claim to rights in the trademark "MovieBuff." But when it registered the domain name with Network Solutions, West Coast did not know of Brookfield's rights in "MovieBuff" (at least Brookfield has not established that it did). Although Brookfield asserts that West Coast could easily have launched its web site at its alternate domain address, "westcoastvideo.com," thereby avoiding the infringement problem, West Coast claims that it had already invested considerable sums in developing its "moviebuff.com" web site by the time that Brookfield informed it of its rights in the trademark. Considered as a whole, this factor appears indeterminate.

■ Importantly, an intent to confuse consumers is not required for a finding of trademark infringement. *See Dreamwerks*, 142 F.3d at 1132 n. 12 ("Absence of malice is no defense to trademark infringement"); *Daddy's Junky Music Stores*, 109 F.3d at 287 ("As noted, the presence of intent can constitute strong evidence of confusion. The converse of this proposition, however, is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source.") (internal quotation marks and citations omitted); *Fleischmann Distilling*, 314 F.2d at 157. Instead, this factor is only relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it as an equitable consideration). *See Sleekcraft Boats*, 599 F.2d at 348 n. 10. Here, West Coast's intent does not appear to bear upon the likelihood of confusion because it

20. Nor did West Coast register its domain name for the specific purpose of subsequently selling the domain name to the trademark owner. *See, e.g., Minnesota Mining*, 21 F.Supp.2d at 1005; *Intermatic*, 947 F.Supp. at 1229 (involving the infamous cyber squat-

ter Dennis Toeppen who registered domain names including "aircanada.com," "deltaairlines.com," "eddiebauer.com," and "neimanmarcus.com" and has been the subject of many lawsuits).

did not act with such an intent from which it is appropriate to infer consumer confusion.

The final three *Sleekcraft* factors—evidence of actual confusion, likelihood of expansion in product lines, and purchaser care—do not affect our ultimate conclusion regarding the likelihood of confusion. The first two factors do not merit extensive comment. Actual confusion is not relevant because Brookfield filed suit before West Coast began actively using the "moviebuff.com" mark and thus never had the opportunity to collect information on actual confusion. The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent. *See Official Airline Guides,* 6 F.3d at 1394. In any case, it is neither exceedingly likely nor unlikely that West Coast will enter more directly into Brookfield's principal market, or vice versa.

▮ Although the district court did not discuss the degree of care likely to be exercised by purchasers of the products in question, we think that this issue deserves some consideration. Likelihood of confusion is determined on the basis of a "reasonably prudent consumer." *Dreamwerks,* 142 F.3d at 1129; *Sleekcraft,* 599 F.2d at 353. What is expected of this reasonably prudent consumer depends on the circumstances. We expect him to be more discerning—and less easily confused—when he is purchasing expensive items, *see, e.g., Official Airline Guides,* 6 F.3d at 1393 (noting that confusion was unlikely among advertisers when the products in question cost from $2,400 to $16,000), and when the products being sold are marketed primarily to expert buyers, *see, e.g., Accuride Int'l, Inc. v. Accuride Corp.,* 871 F.2d 1531, 1537 (9th Cir.1989). We recognize, however, that confusion may often be likely even in the case of expensive goods sold to discerning customers. *See Sleekcraft,* 599 F.2d at 353; *see also, e.g., Daddy's Junky Music Stores,* 109 F.3d at 286; *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988). On the other hand,

when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely. *See, e.g., Gallo,* 967 F.2d at 1293 (wine and cheese).

The complexity in this case arises because we must consider both entertainment professionals, who probably will take the time and effort to find the specific product they want, and movie devotees, who will be more easily confused as to the source of the database offered at West Coast's web site. In addition, West Coast's site is likely to be visited by many casual movie watchers. The entertainment professional, movie devotee, and casual watcher are likely to exercise high, little, and very little care, respectively. Who is the reasonably prudent consumer? Although we have not addressed the issue of purchaser care in mixed buyer classes, another circuit has held that "the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer." *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 283 (3d Cir.1991); *see also Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971) (instructing that, where a product is targeted both to discriminating and casual buyers, a court must consider the likelihood of confusion on the part of the relatively unknowledgeable buyers as well as of the former group); 3 McCarthy § 23:100 (advocating this approach). This is not the only approach available to us, as we could alternatively use a weighted average of the different levels of purchaser care in determining how the reasonably prudent consumer would act. We need not, however, decide this question now because the purchaser confusion factor, even considered in the light most favorable to West Coast, is not sufficient to overcome the likelihood of confusion strongly established by the other factors we have analyzed.

▮ West Coast makes one last ditch argument—that, even if there is a likelihood of confusion, Brookfield should be

estopped from asserting its trademark rights because it waited too long to file suit. Although we have applied laches to bar trademark infringement claims, we have done so only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time. *See E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir.1983). In *E–Systems*, for example, we estopped a claimant who did not file suit until after the allegedly infringing mark had been used for eight years where the claimant had known of the infringing use for at least six years. *See id.; see also Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 803 (9th Cir.1970). We specifically cautioned, however, that "had defendant's encroachment been minimal, or its growth slow and steady, there would be no laches." *E–Systems*, 720 F.2d at 607; *accord Carter–Wallace*, 434 F.2d at 803 n. 4. Here, although Brookfield waited over two years before notifying West Coast that its intended use of "moviebuff.com" would infringe on Brookfield's trademark, West Coast did not do anything with its domain address during that time, and Brookfield filed suit the very day that West Coast publicly announced its intention to launch a web site at "moviebuff.com." Accordingly, we conclude that Brookfield's delay was not such that it should be estopped from pursuing an otherwise meritorious claim. *See generally American Int'l Group*, 926 F.2d at 831 (outlining six-factor test for determining whether laches operates to bar a claim of trademark infringement).[21]

In light of the foregoing analysis, we conclude that Brookfield has demonstrated a likelihood of success on its claim that West Coast's use of "moviebuff.com" violates the Lanham Act. We are fully aware that although the question of "[w]hether confusion is likely is a factual determination woven into the law," we nevertheless must review only for clear error the district court's conclusion that the evidence of likelihood of confusion in this case was slim. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 (9th Cir. 1985) (en banc). Here, however, we are "left with the definite and firm conviction that a mistake has been made." *Pacific Telesis Group v. International Telesis Comms.*, 994 F.2d 1364, 1367 (9th Cir. 1993).[22]

**B**

So far we have considered only West Coast's use of the domain name "moviebuff.com." Because Brookfield requested that we also preliminarily enjoin West Coast from using marks confusingly similar to "MovieBuff" in metatags and buried code, we must also decide whether West Coast can, consistently with the trademark and unfair competition laws, use "MovieBuff" or "moviebuff.com" in its HTML code.[23]

At first glance, our resolution of the infringement issues in the domain name

21. We note, however, that Brookfield should have suspected that West Coast would eventually open a web site at the domain name it had registered, and that the present dispute might have been more easily resolved at an earlier time had Brookfield acted in a more prompt manner.

22. Although there are no other circuit opinions addressing the issue of trademark infringement via domain name use, our holding comports with the decisions of many district courts. *See, e.g., Public Serv. Co.*, 36 F.Supp.2d at 439; ("energyplace.com" and "Energy Place"); *Washington Speakers Bureau*, 33 F.Supp.2d at 498 ("washingtonspeakers.com" and "Washington Speakers Bureau"); *Minnesota Mining*, 21 F.Supp.2d at 1004–05 ("post-it.com" and "Post-it"); *Cardservice Int'l*, 950 F.Supp. at 741–42 ("cardservice.com" and "Card Service"); *Green Prods.*, 992 F.Supp. at 1079 ("greenproducts.com" and "Green Products"); *Comp Examiner Agency*, 1996 WL 376600, at *1 ("juris.com" and "Juris"). *Compare Toys "R" Us*, 26 F.Supp.2d at 643–44 (no likelihood of confusion between "gunsrus.com" and "Toys 'R' Us"); *CD Solutions, Inc. v. Tooker*, 15 F.Supp.2d 986, 989 (D.Or.1998) (no likelihood of confusion between "cds.com" and "CDS" as latter is a generic term).

23. As we explained in Part II, metatags are HTML code not visible to Web users but used by search engines in determining which sites correspond to the keywords entered by a Web

context would appear to dictate a similar conclusion of likelihood of confusion with respect to West Coast's use of "moviebuff.com" in its metatags. Indeed, all eight likelihood of confusion factors outlined in Part V–A—with the possible exception of purchaser care, which we discuss below—apply here as they did in our analysis of domain names; we are, after all, dealing with the same marks, the same products and services, the same consumers, etc. Disposing of the issue so readily, however, would ignore the fact that the likelihood of confusion in the domain name context resulted largely from the associational confusion between West Coast's domain name "moviebuff.com" and Brookfield's trademark "MovieBuff." The question in the metatags context is quite different. Here, we must determine whether West Coast can use "MovieBuff" or "moviebuff.com" in the metatags of its web site at "westcoastvideo.com" or at any other domain address *other than* "moviebuff.com" (which we have determined that West Coast may not use).

Although entering "MovieBuff" into a search engine is likely to bring up a list including "westcoastvideo.com" if West Coast has included that term in its metatags, the resulting confusion is not as great as where West Coast uses the "moviebuff.com" domain name. First, when the user inputs "MovieBuff" into an Internet search engine, the list produced by the search engine is likely to include both West Coast's and Brookfield's web sites. Thus, in scanning such list, the Web user will often be able to find the particular web site he is seeking. Moreover, even if the

Web user chooses the web site belonging to West Coast, he will see that the domain name of the web site he selected is "westcoastvideo.com." Since there is no confusion resulting from the domain address, and since West Coast's initial web page prominently displays its own name, it is difficult to say that a consumer is likely to be confused about whose site he has reached or to think that Brookfield somehow sponsors West Coast's web site.

Nevertheless, West Coast's use of "moviebuff.com" in metatags will still result in what is known as initial interest confusion. Web surfers looking for Brookfield's "MovieBuff" products who are taken by a search engine to "westcoastvideo.com" will find a database similar enough to "Movie-Buff" such that a sizeable number of consumers who were originally looking for Brookfield's product will simply decide to utilize West Coast's offerings instead. Although there is no source confusion in the sense that consumers know they are patronizing West Coast rather than Brookfield, there is nevertheless initial interest confusion in the sense that, by using "moviebuff.com" or "MovieBuff" to divert people looking for "MovieBuff" to its web site, West Coast improperly benefits from the goodwill that Brookfield developed in its mark. Recently in *Dr. Seuss*, we explicitly recognized that the use of another's trademark in a manner calculated "to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement." *Dr. Seuss*, 109 F.3d at 1405 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257–58 (2d Cir. 1987)).[24]

user. Although Brookfield never explained what it meant by "buried code," the leading trademark treatise explains that "buried code" is another term for the HTML code that is used by search engines but that is not visible to users. *See* 3 McCarthy, supra, at § 25:69 n. 1. We will use the term metatags as encompassing HTML code generally.

**24.** The *Dr. Seuss* court discussed initial interest confusion within its purchaser care analysis. As a district court within our circuit

recognized in a recent case involving a claim of trademark infringement via metatags usage, "[t]his case … is not a standard trademark case and does not lend itself to the systematic application of the eight factors." *Playboy Enters. v. Welles*, 7 F.Supp.2d 1098 (S.D.Cal.1998). Because we agree that the traditional eight-factor test is not well-suited for analyzing the metatags issue, we do not attempt to fit our discussion into one of the *Sleekcraft* factors.

The *Dr. Seuss* court, in recognizing that the diversion of consumers' initial interest is a form of confusion against which the Lanham Act protects, relied upon *Mobil Oil.* In that case, Mobil Oil Corporation ("Mobil") asserted a federal trademark infringement claim against Pegasus Petroleum, alleging that Pegasus Petroleum's use of "Pegasus" was likely to cause confusion with Mobil's trademark, a flying horse symbol in the form of the Greek mythological Pegasus. Mobil established that "potential purchasers would be misled into an initial interest in Pegasus Petroleum" because they thought that Pegasus Petroleum was associated with Mobil. *Id.* at 260. But these potential customers would generally learn that Pegasus Petroleum was unrelated to Mobil well before any actual sale was consummated. *See id.* Nevertheless, the Second Circuit held that "[s]uch initial confusion works a sufficient trademark injury." *Id.*

*Mobil Oil* relied upon its earlier opinion in *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1341–42 (2d Cir.1975). Analyzing the plaintiff's claim that the defendant, through its use of the "Grotrian–Steinweg" mark, attracted people really interested in plaintiff's "Steinway" pianos, the Second Circuit explained:

> We decline to hold, however, that actual or potential confusion at the time of purchase necessarily must be demonstrated to establish trademark infringement under the circumstances of this case.
>
> The issue here is not the possibility that a purchaser would buy a Grotrian–Steinweg thinking it was actually a Steinway or that Grotrian had some connection with Steinway and Sons. The harm to Steinway, rather, is the likelihood that a consumer, hearing the "Grotrian–Steinweg" name and thinking it had some connection with "Steinway," would consider it on that basis. The "Grotrian–Steinweg" name therefore would attract potential customers based on the reputa-

tion built up by Steinway in this country for many years.

*Grotrian,* 523 F.2d at 1342.

Both *Dr. Seuss* and the Second Circuit hold that initial interest confusion is actionable under the Lanham Act, which holdings are bolstered by the decisions of many other courts which have similarly recognized that the federal trademark and unfair competition laws do protect against this form of consumer confusion. *See Green Prods.,* 992 F.Supp. 1070, 1076 (N.D.Iowa 1997) ("In essence, ICBP is capitalizing on the strong similarity between Green Products' trademark and ICBP's domain name to lure customers onto its web page."); *Securacomm Consulting, Inc. v. Securacom Inc.,* 984 F.Supp. 286, 298 (D.N.J.1997) (" 'Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.' ") (citing 3 McCarthy § 23:6), *rev'd on other grounds,* 166 F.3d 182, 186 (3d Cir.1999) ("In this appeal, [appellant] does not challenge the district court's finding of infringement or order of injunctive relief."); *Kompan A.S. v. Park Structures, Inc.,* 890 F.Supp. 1167, 1180 (N.D.N.Y.1995) ("Kompan argues correctly that it can prevail by showing that confusion between the Kompan and Karavan lines and names will mistakenly lead the consumer to believe there is some connection between the two and therefore develop an interest in the Karavan line that it would not otherwise have had."); *Blockbuster Entertainment Group v. Laylco, Inc.,* 869 F.Supp. 505, 513 (E.D.Mich. 1994) ("Because the names are so similar and the products sold are identical, some unwitting customers might enter a Video Busters store thinking it is somehow connected to Blockbuster. Those customers probably will realize shortly that Video Busters is not related to Blockbuster, but under [*Ferrari S.P.A. Esercizio v. Roberts,* 944 F.2d 1235 (6th Cir.1991)] and *Grotrian* that is irrelevant."); *Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F.Supp.

506, 514–15 (S.D.N.Y.1993) ("Types of confusion that constitute trademark infringement include where ... potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase."); *Sara Lee Corp. v. Kayser–Roth Corp.*, No. 92–00460, 1992 WL 436279, at *24 (W.D.N.C. Dec. 1, 1992) ("That situation offers an opportunity for sale not otherwise available by enabling defendant to interest prospective customers by confusion with the plaintiff's product."); *Television Enter. Network, Inc. v. Entertainment Network, Inc.*, 630 F.Supp. 244, 247 (D.N.J.1986) ("Even if the confusion is cured at some intermediate point before the deal is completed, the initial confusion may be damaging and wrongful."); *Koppers Co. v. Krupp–Koppers GmbH*, 517 F.Supp. 836, 844 (W.D.Pa. 1981) ("[S]ecuring the initial business contact by the defendant because of an assumed association between the parties is wrongful even though the mistake is later rectified."). *See also Forum Corp. of North America v. Forum, Ltd.*, 903 F.2d 434, 442 n. 2 (7th Cir.1990) ("We point out that the fact that confusion as to the source of a product or service is eventually dispelled does not eliminate the trademark infringement which has already occurred."). *But see Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206–08 (1st Cir.1983) (suggesting that only confusion that affects "the ultimate decision of a purchaser whether to buy a particular product" is actionable); *Teletech Customer Care Mgmt. (Cal.), Inc. v. Tele–Tech Co.*, 977 F.Supp. 1407, 1410, 1414 (C.D.Cal.1997) (finding likelihood of initial interest confusion but concluding that such "brief confusion is not cognizable under the trademark laws").

Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store. Suppose West Coast's competitor (let's call it "Blockbuster") puts up a billboard on a highway reading—"West Coast Video: 2 miles ahead at Exit 7"—where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there. Even consumers who prefer West Coast may find it not worth the trouble to continue searching for West Coast since there is a Blockbuster right there. Customers are not confused in the narrow sense: they are fully aware that they are purchasing from Blockbuster and they have no reason to believe that Blockbuster is related to, or in any way sponsored by, West Coast. Nevertheless, the fact that there is only initial consumer confusion does not alter the fact that Blockbuster would be misappropriating West Coast's acquired goodwill. *See Blockbuster*, 869 F.Supp. at 513 (finding trademark infringement where the defendant, a video rental store, attracted customers' initial interest by using a sign confusingly to its competitor's even though confusion would end long before the point of sale or rental); *see also Dr. Seuss*, 109 F.3d at 1405; *Mobil Oil*, 818 F.2d at 260; *Green Prods.*, 992 F.Supp. at 1076.

The few courts to consider whether the use of another's trademark in one's metatags constitutes trademark infringement have ruled in the affirmative. For example, in a case in which Playboy Enterprises, Inc. ("Playboy") sued AsiaFocus International, Inc. ("AsiaFocus") for trademark infringement resulting from AsiaFocus's use of the federally registered trademarks "Playboy" and "Playmate" in its HTML code, a district court granted judgment in Playboy's favor, reasoning that AsiaFocus intentionally misled viewers into believing that its Web site was connected with, or sponsored by, Playboy. *See Playboy Enters. v. Asiafocus Int'l, Inc.*, No. CIV.A. 97–734–A, 1998 WL 724000, at *3, *6–*7 (E.D.Va. Apr.10, 1998).

In a similar case also involving Playboy, a district court in California concluded that Playboy had established a likelihood of

success on the merits of its claim that defendants' repeated use of "Playboy" within "machine readable code in Defendants' Internet Web pages, so that the PLAYBOY trademark [was] accessible to individuals or Internet search engines which attempt[ed] to access Plaintiff under Plaintiff's PLAYBOY registered trademark" constituted trademark infringement. *See Playboy Enters. v. Calvin Designer Label*, 985 F.Supp. 1220, 1221 (N.D.Cal.1997). The court accordingly enjoined the defendants from using Playboy's marks in buried code or metatags. *See id.* at 1221–22.

In a metatags case with an interesting twist, a district court in Massachusetts also enjoined the use of metatags in a manner that resulted in initial interest confusion. *See Niton*, 27 F.Supp.2d at 102–05. In that case, the defendant Radiation Monitoring Devices ("RMD") did not simply use Niton Corporation's ("Niton") trademark in its metatags. Instead, RMD's web site directly copied Niton's web site's metatags and HTML code. As a result, whenever a search performed on an Internet search engine listed Niton's web site, it also listed RMD's site. Although the opinion did not speak in terms of initial consumer confusion, the court made clear that its issuance of preliminary injunctive relief was based on the fact that RMD was purposefully diverting people looking for Niton to its web site. *See id.* at 104–05.

Consistently with *Dr. Seuss*, the Second Circuit, and the cases which have addressed trademark infringement through metatags use, we conclude that the Lanham Act bars West Coast from including in its metatags any term confusingly similar with Brookfield's mark. West Coast argues that our holding conflicts with *Holiday Inns*, in which the Sixth Circuit held that there was no trademark infringement where an alleged infringer merely took advantage of a situation in which confusion was likely to exist and did not affirmatively act to create consumer confusion. *See Holiday Inns*, 86 F.3d at 622 (holding that the use of "1–800–405–4329"—which is

equivalent to "1–800–H[zero]LIDAY"—did not infringe Holiday Inn's trademark, "1–800–HOLIDAY"). Unlike the defendant in *Holiday Inns*, however, West Coast was not a passive figure; instead, it acted affirmatively in placing Brookfield's trademark in the metatags of its web site, thereby *creating* the initial interest confusion. Accordingly, our conclusion comports with *Holiday Inns*.

C

■ Contrary to West Coast's contentions, we are not in any way restricting West Coast's right to use terms in a manner which would constitute fair use under the Lanham Act. *See New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 306–09 (9th Cir.1992); *see also August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 617–18 (7th Cir.1995). It is well established that the Lanham Act does not prevent one from using a competitor's mark truthfully to identify the competitor's goods, *see, e.g., Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir.1968) (stating that a copyist may use the originator's mark to identify the product that it has copied), or in comparative advertisements, *see New Kids on the Block*, 971 F.2d at 306–09. This fair use doctrine applies in cyberspace as it does in the real world. *See Radio Channel Networks, Inc. v. Broadcast.Com, Inc.*, No. 98 Civ. 4799, 1999 WL 124455, at *5–*6 (S.D.N.Y. Mar.8, 1999); *Bally Total Fitness Holding Corp. v. Faber*, 29 F.Supp.2d 1161 (C.D.Cal.1998); *Welles*, 7 F.Supp.2d at 1103–04; *Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*, No. 96–2703, 1997 WL 811770, at *3–*4 & n. 6 (N.D.Cal. Dec.18, 1997); *see also Universal Tel-A-Talk*, 1998 WL 767440, at *9.

In *Welles*, the case most on point, Playboy sought to enjoin former Playmate of the Year Terri Welles ("Welles") from using "Playmate" or "Playboy" on her web site featuring photographs of herself. *See* 7 F.Supp.2d at 1100. Welles's web site advertised the fact that she was a former

Playmate of the Year, but minimized the use of Playboy's marks; it also contained numerous disclaimers stating that her site was neither endorsed by nor affiliated with Playboy. The district court found that Welles was using "Playboy" and "Playmate" not as trademarks, but rather as descriptive terms fairly and accurately describing her web page, and that her use of "Playboy" and "Playmate" in her web site's metatags was a permissible, good faith attempt to index the content of her web site. It accordingly concluded that her use was permissible under the trademark laws. *See id.* at 1103–04.

■■■■ We agree that West Coast can legitimately use an appropriate descriptive term in its metatags. But "MovieBuff" is not such a descriptive term. Even though it differs from "Movie Buff" by only a single space, that difference is pivotal. The term "Movie Buff" is a descriptive term, which is routinely used in the English language to describe a movie devotee. "MovieBuff" is not. The term "Movie-Buff" is not in the dictionary. *See Merriam–Webster's Collegiate Dictionary* 762 (10th ed.1998); *American Heritage College Dictionary* 893 (3d ed.1997); *Webster's New World College Dictionary* 889 (3d ed.1997); *Webster's Third New Int'l Dictionary* 1480 (unabridged 1993). Nor has that term been used in any published federal or state court opinion. In light of the fact that it is not a word in the English language, when the term "MovieBuff" *is* employed, it is used to refer to Brookfield's products and services, rather than to mean "motion picture enthusiast." The proper term for the "motion picture enthusiast" is "Movie Buff," which West Coast certainly *can* use. It cannot, however, omit the space.

Moreover, West Coast is not absolutely barred from using the term "MovieBuff." As we explained above, that term can be legitimately used to describe Brookfield's product. For example, its web page might well include an advertisement banner such as "Why pay for MovieBuff when you can get the same thing here for FREE?"

which clearly employs "MovieBuff" to refer to Brookfield's products. West Coast, however, presently uses Brookfield's trademark not to reference Brookfield's products, but instead to describe its own product (in the case of the domain name) and to attract people to its web site in the case of the metatags. That is not fair use.

## VI

■■■■ Having concluded that Brookfield has established a likelihood of success on the merits of its trademark infringement claim, we analyze the other requirement for preliminary injunctive relief inquiry, irreparable injury. Although the district court did not address this issue, irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim. *See Metro Pub., Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir.1993) ("Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted."). Preliminary injunctive relief is appropriate here to prevent irreparable injury to Brookfield's interests in its trademark "Movie-Buff" and to promote the public interest in protecting trademarks generally as well.

## VII

As we have seen, registration of a domain name for a Web site does not trump long-established principles of trademark law. When a firm uses a competitor's trademark in the domain name of its web site, users are likely to be confused as to its source or sponsorship. Similarly, using a competitor's trademark in the metatags of such web site is likely to cause what we have described as initial interest confusion. These forms of confusion are exactly what the trademark laws are designed to prevent.

Accordingly, we reverse and remand this case to the district court with instructions to enter a preliminary injunction in

favor of Brookfield in accordance with this opinion.

REVERSED and REMANDED.