**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

QUIKSILVER, INC., a Delaware
corporation,
  *Plaintiff-counter-*
  *claim-defendant-Appellee,*

v.

KYMSTA CORP., a California
corporation,
  *Defendant-counter-*
  *claimant-Appellant.*

No. 04-55529

D.C. No.
CV-02-05497-DT

OPINION

Appeal from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted
December 5, 2005—Pasadena, California

Filed October 6, 2006

Before: Stephen Reinhardt and Johnnie B. Rawlinson,
Circuit Judges, and Claudia Wilken,* District Judge.

Opinion by Judge Rawlinson

*The Honorable Claudia Wilken, United States District Judge for the
Northern District of California, sitting by designation.

17365

**COUNSEL**

William Robinson and James D. Nguyen (argued) of Foley & Lardner LLP, Los Angeles, California, and Arthur Freilich of Freilich, Hornbaker & Rosen, Northridge, California, for appellant Kymsta Corp.

Michael G. Yoder (argued), Amy J. Longo, and Christine E. Cwiertny of O'Melveny & Myers LLP, Newport Beach, California, for appellee Quiksilver, Inc.

## OPINION

RAWLINSON, Circuit Judge:

Kymsta appeals from the district court's decision granting Quiksilver's motion for judgment as a matter of law and denying Kymsta's competing cross-motion. The court concluded that Quiksilver's trademarks, "QUIKSILVER ROXY" and "ROXY," are valid; that Kymsta was unable to rebut the presumption of validity; and that Kymsta could not benefit from the innocent-use defense.

We affirm the district court's granting of Quiksilver's motion for judgment as a matter of law as to Kymsta's fraud defense. We also affirm the denial of Kymsta's cross-motion as to innocent use. However, reasonable minds could differ on the import of the evidence regarding first use of the contested mark, tacking related marks for first-use analysis, the inherent distinctiveness of the contested mark, and Kymsta's innocent-use defense. Therefore, we reverse the judgment as a matter of law in favor of Quiksilver as to those issues.

## I

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.   Quiksilver

Quiksilver is a global company that manufactures sportswear for young men and women. In 1989, Quiksilver decided to launch a juniors' clothing line for teenage girls. As the name for its juniors' line, Quiksilver chose either "QUIKSILVER ROXY" or "ROXY."[1] Quiksilver intended to begin its juniors' line with swimwear and beach cover-ups, and expand into sportswear.

---

[1]Whether Quiksilver opted for "QUIKSILVER ROXY" or "ROXY" is a matter of some dispute.

To design its juniors' line, Quiksilver hired Jill Williams (now Jill Williams Dodd), who began designing the first juniors' line in January or February of 1990, for the 1991 season. Quiksilver used Dodd's designs to create its first promotional poster, featuring a logo displaying "QUIKSILVER" in corporate script on the left, a "Bali-ohm" woman's figure in the middle, and "ROXY" on the right. *See* Figure 1.



Figure 1

In September, 1990, Quiksilver debuted its juniors' line for the 1991 season at a trade show. Quiksilver decorated its showroom with the poster and distributed the poster to its retail customers for display. Quiksilver also took orders for its 1991 juniors' line, shipping its first orders in January, 1991. A hangtag displaying the Bali-ohm logo was attached to each garment shipped.[2]

From January to September, 1991, Dodd designed the juniors' line for the 1992 season. This line included two denim items: a vest displaying a patch with "ROXY" in large letters above "QUIKSILVER" in corporate script, *see* Figure 2, and a "graffiti short" displaying "ROXY" on the right back pocket and "QUIKSILVER" wrapping around from the left front pocket to the left back pocket. *See* Figures 3 and 4.

---

[2]A hangtag is a dangling paper tag that displays information associated with the company.



Figure 2



Figure 3



Figure 4

These denim items were featured in a second promotional poster that was displayed at various trade shows and distributed in 1991. This poster also featured a logo with "ROXY" above "QUIKSILVER." *See* Figure 5.



Figure 5

Quiksilver sold the denim items beginning in September, 1991. A hangtag was affixed to these and all other juniors' apparel Quiksilver sold from the fall of 1991 through 1992. The hangtag for the 1992 line displayed "QUIKSILVER" in corporate script above "ROXY" in a different font. *See* Figure 6.



Figure 6

In 1996, Quiksilver applied for trademark registration for the "QUIKSILVER ROXY" mark. In its application, Quiksilver cited a first-use date of "at least as early as January,

1992." The U.S. Patent and Trademark Office (PTO) issued the registration in July, 1997.

In 1998, Quiksilver applied for a trademark registration for the "ROXY" mark. In that application, Quiksilver also cited a first-use date of "at least as early as January 1, 1992." The PTO issued this registration in February, 2001 over Kymsta's objection.

## B.  Kymsta

Kymsta is a clothing manufacturer and wholesaler. Kymsta produces four lines, only one of which is pertinent here: "ROXYWEAR," a junior contemporary and juniors' line consisting mostly of "hip" and "trendy" knit tops.

Roxanne Heptner co-owns Kymsta with her husband and designs the "ROXYWEAR" line. Heptner initially selected the "Roxy" name, but her trademark search in January, 1992 revealed different variations of Roxy registered to other companies (but not to Quiksilver). Because Heptner and her husband believed that they acquired trademark rights simply by using the "ROXYWEAR" name, they never registered "ROXYWEAR."

The first sale of "ROXYWEAR" product occurred in mid-January, 1992. Before January 1, 1992, Kymsta never affixed "ROXYWEAR" to any product, never offered for sale or sold any product bearing "ROXYWEAR," never had product packaging including the "ROXYWEAR" mark, and never participated in any advertisement that included the "ROXYWEAR" mark.

When Kymsta displays "ROXYWEAR" on its products, it is on the interior clothing label. Originally, Kymsta displayed "ROXYWEAR BY ROXANNE HEPTNER." In 1997, Kymsta changed its label to display "ROXYWEAR BY ROXX." In 1999, Kymsta again changed its interior label to display

Asian script (meaning "think happy") on the front and "ROXYWEAR BY ROXX" on the back. Kymsta has never used "ROXYWEAR" on the fabric of its garments or on hangtags, and, in recent years, Kymsta has largely distributed its merchandise as private-label apparel.[3]

## C.   The District Court's Decision

In 2002, Quiksilver filed suit against Kymsta for trademark infringement, false designation of origin, trademark dilution, and unfair competition. In response, Kymsta raised several defenses — including fraud, first use, inherent distinctiveness, and innocent use — and filed a counterclaim asserting unfair competition and false designation of origin claims.

On the eighth day of trial, each party moved for judgment as a matter of law. The district court granted Quiksilver's motion as to Kymsta's counterclaim and as to Kymsta's fraud, first-use, inherent distinctiveness, and innocent-use defenses. Concluding that the first use of "ROXY" was on the 1991 graffiti short and that tacking applies, the court ruled that the "QUIKSILVER ROXY" and "ROXY" marks are valid and that Quiksilver is the senior user.

The court granted Kymsta's cross-motion only as to Quiksilver's trademark dilution claims. The remainder of Kymsta's cross-motion was denied. The court ruled that laches barred Quiksilver from enjoining Kymsta's present use of "ROXYWEAR," and barred Kymsta from enjoining Quiksilver's use of "QUIKSILVER ROXY" and "ROXY." The court entered an injunction reflecting its ruling.[4]

---

[3]Private labeling occurs when a retailer places its own label on a garment that it purchases from a manufacturer.

[4]Because we are reversing the district court's granting of judgment as a matter of law, the accompanying injunction is necessarily vacated. *See TransWorld Airlines, Inc. v. American Coupon Exch., Inc.*, 913 F.2d 676, 693, 698 (9th Cir. 1990). However, we note that the inclusion of the

## II

## *DISCUSSION*

"We review de novo an order granting or denying judgment as a matter of law." *Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir. 1998) (citation omitted). "Judgment as a matter of law is proper when the evidence permits a reasonable jury to reach only one conclusion." *Id.* (citations omitted). "If reasonable minds could differ as to the import of the evidence," however, judgment as a matter of law should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (citation omitted). "In making this determination, we must consider all the evidence and all reasonable inferences which may be drawn from the evidence in a light most favorable to [Kymsta], the party against whom the motion for [judgment as a matter of law] was made." *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir. 1977) (citations omitted).

### A.   The "QUIKSILVER ROXY" and "ROXY" Marks Are Presumed Valid.

**[1]** Federal registration of a trademark "constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark" in commerce. *Brookfield Commc'ns, Inc. v. West Coast Entm't*

---

"knock-offs" prohibition in the injunction goes beyond the claims asserted in the complaint and the evidence presented at trial, in contravention of well-settled Ninth Circuit authority holding that "a court may not, without the consent of all persons affected, enter a judgment which goes beyond the claim asserted in the pleadings." *Crawford v. Gould*, 56 F.3d 1162, 1168 (9th Cir. 1995) (citations and alteration omitted).

We also note that the parties on appeal do not contest the court's rulings on false designation of origin, statutory and common law unfair competition, federal and state trademark dilution, federal and common law trademark infringement, or laches. We express no opinion on these rulings.

*Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) (citations omitted); *Dep't of Parks & Recreation v. Bazaar del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). Quiksilver federally registered its "QUIKSILVER ROXY" and "ROXY" marks; therefore, the marks enjoy the presumption of validity.

Kymsta contends that the "ROXY" mark should not be presumed valid because Quiksilver committed fraud on the PTO during the "ROXY" registration process by failing to disclose its knowledge of the "ROXYWEAR" mark.[5]

**[2]** "Fraud in procuring a mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1351 (Fed. Cir. 1999) (citations and alteration omitted).

**[3]** In the application process, Robert McKnight, Quiksilver's Chief Executive Officer, signed an oath on behalf of Quiksilver attesting that he believed Quiksilver to be the owner of the "ROXY" mark and that, "to the best of his knowledge and belief, no other person, firm, corporation or association has the right to use [the "ROXY"] mark in commerce . . ." In the face of McKnight's attestation, mere knowledge of the existence of the "ROXYWEAR" mark does not constitute fraud. *See Yocum v. Covington*, 216 U.S.P.Q. 210, 216-17 (T.T.A.B. 1982) ("[T]he statement of an applicant that no other person 'to the best of his knowledge' has the right to use the mark does not require the applicant to disclose those persons whom he may have heard are using the mark *if he feels that the rights of such others are not superior to his*.") (emphasis added).

**[4]** Because reasonable minds could not differ regarding the presumed validity of Quiksilver's marks, the district court

---

[5]There is no dispute regarding the validity of the "QUIKSILVER ROXY" mark.

correctly granted judgment as a matter of law in favor of Quiksilver on Kymsta's fraud defense. Accordingly, both "QUIKSILVER ROXY" and "ROXY" enjoy the presumption of validity.

**B.  Kymsta Presented Evidence to Rebut the Presumption of Validity Afforded Quiksilver's Marks, Foreclosing Judgment as a Matter of Law in Favor of Quiksilver.**

The presumption of validity may be rebutted "by showing that the registrant had not established valid ownership rights in the mark at the time of registration"; that is, "if [Kymsta] can show that [it] used the mark in commerce first, then the registration may be invalidated." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996); *Dep't of Parks & Recreation*, 448 F.3d at 1124-26.

**1.  Kymsta Introduced Evidence That It First Used "ROXYWEAR" Before Quiksilver First Used "ROXY."**

[5] Trademark rights are acquired by the party that first uses a mark in connection with the sale of goods. *Sengoku Works Ltd.*, 96 F.3d at 1219; *Dep't of Parks & Recreation*, 448 F.3d at 1125-26. A mark is used in the sale of goods when "it is placed in any manner on the goods . . . or the displays associated therewith or on the tags or labels affixed thereto . . . ." 15 U.S.C. § 1127 (Supp. 2005); *Dep't of Parks & Recreation*, 448 F.3d at 1125-26.[6]

---

[6]Relying on *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1473 (Fed. Cir. 1987), Kymsta contends that Quiksilver, in attempting to prove that "QUIKSILVER ROXY" and "ROXY" have priority over "ROXYWEAR," should have been held to the clear and convincing evidence standard, because Quiksilver attempted to prove first-use dates that preceded the dates averred in its federal registrations. However, because Kymsta conceded that "QUIKSILVER ROXY" has priority over "ROXY-

### a. Reasonable Minds Could Differ on Whether Quiksilver First Used "ROXY" as a Standalone Mark Before Kymsta First Used "ROXY-WEAR."

**[6]** Quiksilver's 1991 graffiti short displayed "QUIK-SILVER" beginning on the left front side, wrapping around to the left back side.[7] The short also displayed "ROXY" on the right back side. *See* Figures 3 and 4. Viewing the back of the short, "ROXY" is fully discernable, but only the last four letters of "QUIKSILVER" appear on the left side. *See id.* In view of the fact that both "QUIKSILVER" and "ROXY" were conspicuously displayed on the short in relatively close proximity, a reasonable jury could conclude that the short did not display "ROXY" as a standalone mark; an equally appropriate inference is that the short displayed the "QUIKSILVER ROXY" mark.

The district court appeared to rule that Quiksilver used "ROXY" as a standalone mark on the first promotional poster, which featured the Bali-ohm logo. Assuming (without deciding) that this poster is relevant to proving that Quiksilver first used the "ROXY" mark in connection with the sale of

---

WEAR," Quiksilver had no need to prove first use of the "QUIKSILVER ROXY" mark at all, let alone by clear and convincing evidence. *See Baxter v. MCA, Inc.*, 812 F.2d 421, 424 n.2 (9th Cir. 1987).

As to the "ROXY" mark, the registration lists the first-use date as "at least as early as January 1, 1992," which precedes Kymsta's first use of "ROXYWEAR" in mid-January, 1992. Quiksilver's evidence supports the averment in its registration that it used "ROXY" at least as early as January 1, 1992. Quiksilver need not prove a first-use date that is earlier than that alleged in its registration application. Therefore, the clear and convincing evidence standard was never triggered.

[7]At oral argument, Quiksilver suggested that the denim vest displayed "ROXY" as a standalone mark. However, because "ROXY" appears directly above "QUIKSILVER," reasonable minds could infer that the vest displayed the "QUIKSILVER ROXY" mark.

apparel, reasonable minds could also differ on whether the Bali-ohm logo displayed the standalone "ROXY" mark or the "QUIKSILVER ROXY" mark.[8]

**[7]** In view of the evidence in the record,[9] the district court erred in ruling as a matter of law that Quiksilver first used "ROXY" as a standalone mark before Kymsta first used "ROXYWEAR."

> **b.  Reasonable Minds Could Differ on Whether Quiksilver Created Independent Trademark Significance for Its "ROXY" Mark Before Kymsta First Used "ROXYWEAR."**

Quiksilver argues, in the alternative, that the evidence at trial established that the "ROXY" mark, used in conjunction with the "QUIKSILVER" house mark in 1990 and 1991, acquired independent trademark significance as Quiksilver's mark for its juniors' line. This contention provides an independent basis for concluding that Quiksilver is the senior user of "ROXY." *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989).

**[8]** A product mark like "ROXY," even if always displayed with a house mark like "QUIKSILVER," may acquire independent trademark significance. *See Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1374 (Fed. Cir. 2002). Whether

---

[8]Quiksilver also used the Bali-ohm logo on hangtags that it attached to all juniors' apparel. For the same reason, these hangtags do not conclusively display "ROXY" as a standalone mark.

[9]The record does reveal a poster displaying "ROXY" alone. At oral argument, however, Quiksilver disavowed reliance on this poster. In addition, Dodd testified that Quiksilver did not use the poster or the "ROXY" mark on the poster during her employment with Quiksilver, which ended in February, 1992. Her testimony serves as adequate evidence to support an inference that the "ROXY" mark as displayed on the poster was not used until sometime after she left in February, 1992, which is after Kymsta began using its "ROXYWEAR" mark.

"ROXY" acquired trademark significance independent of "QUIKSILVER" "depends on the manner of use and the commercial impression engendered by that use." *Id.* (citation omitted). The question is whether "ROXY" is "recognized in and of itself as an indication of origin" for the product. *Textron Inc. v. Cardinal Eng'g Corp.*, 164 U.S.P.Q. 397, 399 (T.T.A.B. 1969).

In determining whether a mark has independent trademark significance, we consider whether the mark owner has engaged in "a constant pattern or effort . . . to use . . . [the product mark] in a manner separate and distinct from [the house mark]." *See id.* at 400 (holding that a product mark, "ZIP," had a separate commercial impression from its house mark, "HOMELITE," because, *inter alia*, " 'ZIP' is always set off by three arcs or by different logo and print style or by different size lettering or by using it alone [and/or] in varying positions apart from 'HOMELITE'."). "[C]onsumer awareness of the product mark apart from the fame of the associated house mark," the "strength of the public reputation of the product mark," and the "nature and context of promotion" are also "reliable test[s] of the independence of the product mark from its parent house mark." *Bose Corp.*, 293 F.3d at 1374.

**[9]** Quiksilver asserts that whenever it displayed "ROXY" with the "QUIKSILVER" house mark in 1990 and 1991, they were displayed in a separate and distinct manner. For example, Quiksilver's second season hangtags displayed "QUIKSILVER" in corporate script and "ROXY" in a different size, font, and color. This evidence may suggest that "ROXY" acquired independent trademark significance, but it certainly does not establish it. In fact, evidence to the contrary exists, as McKnight and Danny Kwock, President of Quiksilver Entertainment, testified that when Quiksilver launched its juniors' line, they were concerned because "no one would know who Roxy was at that time." Consequently, Quiksilver decided to associate "ROXY" with "QUIKSILVER" to take advantage of Quiksilver's reputation.

**[10]** The evidence also evinces a lack of promotion. Besides distributing free clothes and posters, Quiksilver did no consumer advertising for the "ROXY" brand at least through October 31, 1992, and did not advertise nationally in mainstream publications until 1995 or 1996. *Cf. Kellogg Co. v. Gen. Foods Corp.*, 166 U.S.P.Q. 281, 282 (T.T.A.B. 1970) (recognizing the existence of independent trademark significance partially because "[e]xpenditures for media advertising ha[d] increased from a sum in excess of one hundred and seventy-five thousand dollars . . . to more than three million dollars . . .").

**[11]** The totality of the evidence could lead a reasonable jury to conclude that, by mid-January, 1992, consumers were not aware of "ROXY" apart from its association with "QUIKSILVER"; that the strength of the reputation of the "ROXY" mark was low; and that promotion for "ROXY" was weak, *see Bose Corp.*, 293 F.3d at 1374; and, therefore, that "ROXY" was not "recognized in and of itself as an indication of origin" of Quiksilver's juniors' line. *See Textron Inc.*, 164 U.S.P.Q. at 399.

### c. Reasonable Minds Could Differ on Whether Quiksilver May Tack the First-Use Date for Its "QUIKSILVER ROXY" Mark onto Its "ROXY" Mark.

Kymsta conceded that Quiksilver used its "QUIKSILVER ROXY" mark in 1990 or 1991, and that "QUIKSILVER ROXY" has priority over "ROXYWEAR." Ruling that tacking applies, the district court determined that "Quiksilver Roxy and Roxy are one and the same" and "ROXY" can benefit from "QUIKSILVER ROXY's" 1990 or 1991 first-use date.

**[12]** Under the tacking doctrine, a mark owner "essentially seeks to 'tack' his first use date in the earlier mark onto the subsequent mark." *Brookfield Commc'ns, Inc.*, 174 F.3d at

1048 (citation omitted). Tacking permits a mark owner "to claim priority in a mark based on the first use date of a similar, but technically distinct, mark — but only in the exceptionally narrow instance where the previously used mark is the legal equivalent of the mark in question or indistinguishable therefrom such that consumers consider both as the same mark." *Id.* at 1047-48 (citations and internal quotation marks omitted). "The standard for tacking . . . is exceedingly strict: The marks must create the same, continuing commercial impression, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked." *Id.* at 1048 (emphasis, citation, and internal quotation marks omitted). The later mark must be indistinguishable from the original mark at the time that the later mark is introduced. *See id.*; *see also KeyCorp v. Key Bank & Trust*, 99 F. Supp. 2d 814, 820 (N.D. Ohio 2000).[10]

**[13]** Kymsta asserts that the district court erred by deciding tacking as a matter of law. Whether tacking is an issue of law or fact is a matter of first impression in this circuit. The only circuits that have addressed this issue are the Federal Circuit and the Sixth Circuit, and both consider tacking a legal question for the court. *See Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991); *see also Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998).

The Federal Circuit arrived at its conclusion by citing to,

---

[10]In deciding whether tacking applies, courts often compare the earlier mark with the subsequent mark to determine whether the two marks create "the same, continuing commercial impression." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1048-49 (emphasis omitted) (reviewing cases). The similarities or dissimilarities between two marks constitute evidence of whether consumers view them as indistinguishable. *See id.* at 1047-48. In this case, we are unable to compare the two marks because Quiksilver has not delineated the attributes of its "QUIKSILVER ROXY" mark; therefore, we are left without a referent against which to compare the "ROXY" mark.

and relying on, its cases that treat "likelihood of confusion" — an analogous consideration — as a question of law. *See Van Dyne-Crotty, Inc.*, 926 F.2d at 1159 (citing *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1565 (Fed. Cir. 1987), and *In re Bed & Breakfast Registry*, 791 F.2d 157, 158 (Fed. Cir. 1986)). In reaching the same conclusion, the Sixth Circuit relied on the Federal Circuit's decision in *Van Dyne-Crotty, Inc. See Data Concepts, Inc.*, 150 F.3d at 623.[11]

**[14]** In contrast, we have analyzed likelihood of confusion as a question of fact. *See Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002). Applying the approach of the Federal Circuit and the Sixth Circuit, we conclude that because we have analyzed the analogous consideration of likelihood of confusion as a factual question, whether tacking applies should also be analyzed as a question of fact. Although the outcome differs, the approach is consistent with that taken by our sister circuits.

**[15]** A question of fact may be resolved as a matter of law if reasonable minds cannot differ and the evidence permits only one conclusion. *See Sanders v. Parker Drilling Co.*, 911 F.2d 191, 194 (9th Cir. 1990). However, the evidence proffered by Quiksilver does not conclusively meet the "exceedingly strict" standard that, at the time the "ROXY" brand was introduced, consumers considered both "QUIKSILVER ROXY" and "ROXY" as the same mark. *See Brookfield Commc'ns, Inc.*, 174 F.3d at 1048; *see also KeyCorp*, 99 F. Supp. 2d at 820. McKnight testified that, when the "ROXY" brand was launched, he decided to associate the "ROXY" brand with "QUIKSILVER" because he was concerned that "no one would know who Roxy was." Randy Hild, Quiksilver's Senior Vice President of Marketing, confirmed that, without combining the "ROXY" brand with "QUIKSILVER,"

---

[11]Subsequent Sixth Circuit cases have analyzed likelihood of confusion as a mixed question of fact and law. *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 548 n.11 (6th Cir. 2005).

some people would not have recognized the "ROXY" brand as being from the Quiksilver company, and the presence of "QUIKSILVER" next to the "ROXY" brand could make a difference on how a consumer perceives the trademark. Finally, Dodd stated that the name of the brand given to the juniors' line was "QUIKSILVER ROXY" because "no one would have known what 'Roxy' was."

**[16]** This is evidence from which a reasonable jury could easily conclude that "QUIKSILVER ROXY" and "ROXY" did not create the "same, continuing commercial impression" at the time the "ROXY" brand was introduced. Therefore, the decision to allow Quiksilver to tack its priority in "QUIK-SILVER ROXY" onto "ROXY" was erroneous. *See Brookfield Commc'ns, Inc.*, 174 F.3d at 1049 ("[I]t would be clearly contrary to well-established principles of trademark law to sanction the tacking of a mark with a narrow commercial impression onto one with a broader commercial impression." (quoting *Van Dyne-Crotty, Inc.*, 926 F.2d at 1160)).

### 2.  Kymsta Presented Evidence That "ROXY" Is Not an Inherently Distinctive Mark.

"There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005) (citation omitted). At one end of the spectrum, generic marks "give the general name of the product; they embrace an entire class of products." *Id.* (citation omitted). "Generic marks are not capable of receiving protection because they identify the product, rather than the product's source." *Id.* (citation omitted). At the other end of the spectrum, suggestive, arbitrary, and fanciful marks are "deemed inherently distinctive and are automatically entitled to protection because they naturally serve to identify a particular source of a product." *Id.* (citation, alterations, and internal quotation marks omitted).

Descriptive marks "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Id.* (citation omitted). "A descriptive mark can receive trademark protection if it has acquired distinctiveness by establishing 'secondary meaning' in the marketplace." *Id.* (citation omitted); *Dep't of Parks & Recreation*, 448 F.3d at 1127-28.

"Secondary meaning is used generally to indicate that a mark . . . 'has come through use to be uniquely associated with a specific source.' 'To establish secondary meaning, [the relevant party] must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n.4 (1992) (citations omitted).

**[17]** Where, as here, the PTO issues a mark registration without requiring proof of secondary meaning, the registrant (Quiksilver) enjoys a "presumption that the purchasing public perceives the ["ROXY"] mark to be inherently distinctive." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *see also Yellow Cab Co. of Sacramento*, 419 F.3d at 928.

Kymsta seeks to rebut this presumption, contending that "ROXY" is not inherently distinctive because it is a female name. "[P]ersonal names — both surnames and first names — are generally regarded as descriptive terms," *815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir. 1988) (citations omitted), which are not inherently distinctive. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992). To overcome the presumption in reliance on this theory, Kymsta must present evidence that "the primary significance of the mark to the purchasing public is that of [primarily only] a [name]." *Lane Capital Mgmt., Inc.*, 192 F.3d at 345 (citation omitted). "[T]he relevant purchasing

public is not the population at large, but prospective purchasers of the product." *Id.* (citation omitted).

To establish that prospective purchasers perceived "ROXY" as primarily only a name, Kymsta presented evidence that "ROXY" is a female name; that "ROXY" is the name of McKnight's daughter, as well as the daughter of the co-founder of Australian Quiksilver; and that Quiksilver employees and materials, including a promotional video, associated "ROXY" with McKnight's daughter.

In *Lane Capital Management, Inc.*, appellant, like Kymsta in this case, argued that "Lane" in "Lane Capital Management" is not inherently distinctive because Lane is primarily only a surname. *Id.* at 341, 346. To support its argument, appellant presented evidence indicating that Lane is indeed a popular surname. *Id.* at 346. The Second Circuit held, however, that such evidence "is insufficient to create a genuine issue for trial" because it "does not meet the burden of proving that it is primarily *only* a surname, especially since Lane — unlike, for example, Harris — does have a dictionary definition." *Id.* (emphasis in the original).

**[18]** In this case, although there is evidence that "ROXY" was the name of a theater and a night club and connoted "Rock 'N' Roll," "ROXY," unlike Lane, does not have a dictionary definition, suggesting that it is primarily only (if not only) a name. The absence of a dictionary definition for "ROXY," together with Kymsta's evidence — which included evidence from which a reasonable jury could infer that Quiksilver used advertising material that associated "ROXY" with the name of McKnight's daughter — distinguish this case from *Lane Capital Management, Inc.* This evidence, construed in the light most favorable to Kymsta, reasonably supports an inference that prospective purchasers perceived "ROXY" as primarily only a name. Accordingly, judgment as a matter of law in favor of Quiksilver on the issue of inherent distinctiveness was not warranted.

### C. Kymsta Introduced Evidence to Support Its Defense of Innocent Use Under 15 U.S.C. § 1115(b)(5).

To establish innocent use, Kymsta had the burden to prove that it (1) adopted the "ROXYWEAR" mark without actual or constructive knowledge of Quiksilver's prior use of "QUIK-SILVER ROXY" and "ROXY," (2) used "ROXYWEAR" before Quiksilver filed its trademark applications for the "QUIKSILVER ROXY" and "ROXY" marks, and (3) continuously used the "ROXYWEAR" mark after Quiksilver filed its applications. *See* 15 U.S.C. § 1115(b)(5); *see also Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc.*, 493 F.2d 709, 712 (9th Cir. 1974).

**[19]** According to Quiksilver, there is or should be a fourth element to this defense: remoteness, which is an element of the common law innocent-use defense. A remoteness element would require Kymsta to prove that neither "QUIKSILVER ROXY" nor "ROXY" was known in the geographical and trade area where Kymsta first used "ROXYWEAR." *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1124 (6th Cir. 1996). However, we hold that remoteness is not an element of the innocent-use defense under 15 U.S.C. § 1115(b)(5).

**[20]** The central reason for our holding is simple: The text of 15 U.S.C. § 1115(b)(5) does not contain a remoteness element. Conceding this point, Quiksilver counters that *Southland Corp. v. Schubert*, 297 F. Supp. 477 (C.D. Cal. 1968), incorporated a remoteness element into the statute. We do not construe *Southland Corp.* as supporting Quiksilver's incorporation argument. Rather, in *Southland Corp.*, the district court merely observed that § 1115(b)(5) "appears to be nothing more than the common law of innocence . . ." *Id.* at 481. This equivocal observation does not constitute a holding that § 1115(b)(5) incorporates a remoteness requirement. Indeed, the Fourth Circuit has noted that "[§ 1115(b)(5)] appears to

have eliminated 'remoteness' as a requirement for the defense." *Emergency One, Inc. v. American Fire Eagle Engine Co.*, 332 F.3d 264, 272 n.4 (4th Cir. 2003) (citation omitted); *see also GTE Corp. v. Williams*, 904 F.2d 536, 540-41 (10th Cir. 1990) (analyzing the common law and statutory versions of the innocent-use defense separately and discussing remoteness only when analyzing the common law version); *Thrifty Rent-A-Car Sys., Inc. v. Thrift Cars, Inc.*, 831 F.2d 1177, 1182-83 (1st Cir. 1987) (reciting and applying only the express provisions of § 1115(b)(5), with no mention of a remoteness element).

We recognize that there are persuasive reasons to incorporate a remoteness element into 15 U.S.C. § 1115(b)(5). *See, e.g.*, J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26:48 (4th ed. 1996) (iterating that § 1115(b)(5) "does not explicitly recite the element of 'remoteness' which is crucial to the common law defense," and advocating the element's incorporation into § 1115(b)(5)) (footnote reference omitted). The Sixth Circuit, in fact, has apparently incorporated a remoteness element into § 1115(b)(5). *See Champions Golf Club, Inc.*, 78 F.3d at 1124 (instructing the district court on remand to make a threshold remoteness determination). However, in our view, amending § 1115(b)(5) "is the role of Congress, not the courts." *Conner v. Burford*, 848 F.2d 1441, 1455 (9th Cir. 1988). For this reason, we decline Quiksilver's invitation to incorporate a remoteness element into § 1115(b)(5).

Absent a remoteness element, Quiksilver's remaining challenge is to the "continuous use" element of the innocent-use defense. This element includes a "zone of reputation" component and a "continuous use" component. When Quiksilver filed its trademark applications, Kymsta's trade area for "ROXYWEAR" was frozen; Kymsta's continuous use assertion is limited to those areas where "ROXYWEAR" then enjoyed recognition based on its reputation, advertising, and

sales. *See Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693-95 (5th Cir. 1995).

To maintain its trademark rights in the operative areas, Kymsta also had to establish that it continuously used "ROXYWEAR" from the time Quiksilver filed its trademark applications through the time of trial. *See Thrifty Rent-A-Car Sys., Inc.*, 831 F.2d at 1182-83; *see also Casual Corner Assocs., Inc.*, 493 F.2d at 712 ("To be a continuing use, the use must be maintained without interruption."). Where usage is interrupted, the innocent-use defense "dries up," precluding the innocent user from asserting trademark rights in those areas. *Thrifty Rent-A-Car Sys., Inc.*, 831 F.2d at 1183.

**[21]** Kymsta introduced evidence of zones of reputation. For example, Heptner testified that "ROXYWEAR" has "built up a reputation" as "a very trendy collection." Anna Lew of Nordstrom essentially agreed, stating that she has come to expect "cute tops" from "ROXYWEAR." Likewise, Laura O'Connor of Urban Outfitters attested that Kymsta has "a great designer and their product quality is excellent." "ROXYWEAR" sales were also documented in the record, reflecting that "ROXYWEAR" was sold to "Merry-Go-Round" in Maryland and "Contempo Casual" in Los Angeles, California, as well as various Nordstrom locations.

**[22]** Additionally, Kymsta presented evidence of continuous use. Heptner testified that Kymsta has continuously sold "ROXYWEAR" merchandise since 1992. In response, Quiksilver submits that Kymsta cannot show continuous use of "ROXYWEAR" because Kymsta has sold, and continues to sell, certain "ROXYWEAR" product under a private label, which "dissociat[es] the ROXYWEAR mark from the product." However, Quiksilver has not cited, and we could not find, any authority holding that continuous use is interrupted where an innocent user begins selling certain product under a private label. On the contrary, we have only concluded that interruption occurred when there was complete non-use of a

mark for a one-year period, or the innocent user closed its stores without any intent to reopen them. *See Casual Corner Assocs., Inc.*, 493 F.2d at 712-13. No comparable evidence was presented in this case.

**[23]** As Kymsta introduced evidence from which a reasonable jury could conclude that the continuous use element was met, granting Quiksilver's motion for judgment as a matter of law as to Kymsta's innocent-use defense under 15 U.S.C. § 1115(b)(5) was unwarranted.

## III

### *CONCLUSION*

The district court correctly held that the "QUIKSILVER ROXY" and "ROXY" marks were not obtained fraudulently and may benefit from the presumption of validity. However, the court erred in holding as a matter of law that Kymsta could not rebut the presumption of validity as to the "ROXY" mark. Kymsta presented evidence from which a reasonable jury could conclude that "ROXY" was not first used as a standalone mark in 1991; "ROXY" did not have trademark significance independent from the "QUIKSILVER" house mark; "QUIKSILVER ROXY" and "ROXY" did not create the "same, continuing commercial impression" for purposes of tacking; and "ROXY" was not an inherently distinctive mark. The court also erred in granting Quiksilver's motion for judgment as a matter of law on Kymsta's innocent-use defense under 15 U.S.C. § 1115(b)(5). However, we affirm the court's granting of Quiksilver's motion for judgment as a matter of law as to Kymsta's fraud defense. We also affirm the court's denial of Kymsta's cross-motion for judgment as a matter of law as to innocent use. We reverse the court's decision to grant judgment as a matter of law in favor of

Quiksilver as to first use, tacking, inherent distinctiveness, and innocent use; and remand.[12]

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**. Each party is to bear its own costs on appeal.

---

[12]We note that the district court also correctly concluded that Kymsta's evidence of damages, as presented, is speculative.